**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**

United States District Court
Southern District of Texas
FILED

**FEB 22 2000**

Michael N. Milby, Clerk

| | | |
|---|---|---|
| BOREAN OIL COMPANY, JON C. | § | |
| LEWIS, THOMAS R. LEWIS, DYER S. | § | |
| WADSWORTH, CASS COUNTY IRON | § | |
| COMPANY, AND JACK L. VAUGHN | § | |
| &ASSOCIATES, INC. | § | |
| | § | |
| vs. | § | CIVIL ACTION NO._____ |
| | § | |
| | § | **C-00-074** |
| | § | |
| | § | |
| SKLAR EXPLORATION COMPANY, | § | |
| L.L.C., AND SKLAR-TEX, L.L.C. | § | |

## PLAINTIFFS' ORIGINAL PETITION AND APPLICATION
## FOR TEMPORARY INJUNCTION AND ORDER TO ARBITRATE

TO THE HONORABLE JUDGE OF SAID COURT:

NOW COMES, Plaintiffs, Borean Oil Company, Jon C. Lewis, Thomas R. Lewis, Dyer S.

Wadsworth, Cass County Iron Company, and Jack L. Vaughn &Associates, Inc., and in support of

this Plaintiffs' Original Petition and Application for Temporary Injunction and Order to Arbitrate,

would show the Court as follows:

1.     Defendants in this cause of action are:

a)     Sklar Exploration Company, L.L.C., a Louisiana Corporation, who may be served

through its registered agent, Malcolm S. Murchison, 401 Edwards Street, 10th Floor,

Shreveport, Louisiana 71101; and

b)     Sklar-Tex, L.L.C., a Louisiana Corporation, who may be served through its registered

agent, Malcolm S. Murchison, 401 Edwards Street, 10th Floor, Shreveport, Louisiana

71101;

2.     Nueces County is the proper place to file this claim, pursuant to Texas Civil Remedies Code, Chapter 171, Uniform Arbitration Act, and Jurisdiction is proper in that there is complete diversity of citizenship between the Plaintiffs and Defendants, and the amount in controversy exceeds $50,000.00.

3.     This suit is brought in part to compel arbitration pursuant to written agreement between the parties and the Uniform Arbitration Act, Texas Civil Remedies Code, Chapter 171, et seq. Plaintiffs would show this Court that pursuant to the agreement of the parties, the laws of the State of Texas applies to this case.

4.     Defendant Sklar-Tex, L.L.C. was the operator of an oil and gas prospect known as Cass County Smackover Prospect, Cass County, Texas, its affiliate entity, Sklar Exploration Company, L.L.C. is a working interest owner in the same prospect.

5.     A dispute has arisen between the working interest owners and the operator as to the right of the Defendant, Sklar-Tex, L.L.C. to continue as the operator.

6.     In June of 1999, all working interest owners entered into a Lease Purchase and Development Agreement, Cass County Smackover Prospect, Cass County, Texas, (herein after referred to as the "Agreement") to develop the Cass County Smackover Prospect. Pursuant to the Agreement, Sklar-Tex, L.L.C. was appointed operator by all working interest owners.

7.     Subsequently, Sklar-Tex, L.L.P. terminated its relationship with a contract operator and its affiliated company, Sklar Exploration Company, L.L.P., proposed a developmental well.

8.     The majority of the working interest owners have given Sklar-Tex, L.L.C. notice of its removal as operator. The working interest owners who gave this notice and have joined in this action are Borean Oil Company, Jon C. Lewis, Thomas R. Lewis, Dyer S. Wadsworth, Cass County

Iron Company, and Jack L. Vaughn & Associates, Inc. (63.17 percent of the working interest estate before payout. The prospect has not achieved payout).

9.      A majority of the working interest owners have chosen Borean Oil Company to act as operator.

10.     Sklar-Tex, L.L. C. has refused to acknowledge its removal as operator and the subsequent appointment of Borean Oil Company as operator by a majority of the working interest owners. Sklar-Tex, L.L.C. has asserted that it cannot be removed as operator unless it has "failed or refused to carry out its duties".

11.     Plaintiffs assert that the provisions of the Model Form Operating Agreement (Exhibit "C" to the Agreement), relied upon by Sklar-Tex, L.L.C., has been modified and is subject to the terms of the Agreement. The Agreement provides that the operator may be removed by "a vote of a majority interest of the working interest owners." The appointment of a successor operator is by an affirmative vote of two or more of the working interest owners owning a majority interest in the prospect.

12.     Plaintiffs have removed Sklar-Tex, L.L.C. by majority vote of the working interest owners and have selected Borean Oil Company as replacement operator by majority vote of the working interest owners.

13.     Sklar Exploration Company, L.L.C. has mailed to the Plaintiffs a proposal to drill the Johnson No. 1 Well, L.M. Campbell Survey, Abstract 212, Cass County, Texas. The proposal was mailed on February 9, 2000. This Notice was given after Sklar-Tex, L.L.C. had been notified of its removal as operator. Any proposed well must be managed by the operator. Pursuant to the Agreement of the parties, the working interest owners have thirty (30) days to elect to participate or

CutePDF - www.fastio.com

not participate in the new well.  It is probable that conflicting positions will be taken by Sklar-Tex, L.L.C. and Borean Oil Company, resulting in irreparable harm or damage to the working interest owners and the prospect, including a determination of nonparticipation as to the proposed well.  The Agreement provides for arbitration, but does not provide for an immediate means of resolving this dispute by arbitration. The Agreement is clear from its four corners that a majority of the working interest owners may remove the operator, and, therefore, it is probable that Plaintiffs will prevail at arbitration.  If the Order is not granted, the Defendants can use the authority of the operator to adversely affect the Plaintiffs.  It is in the public interest to see that written agreements and alternative means of dispute resolution can be used to effectuate a resolution of a dispute.

14.     The agreement between the parties provides that the parties may recover reasonable and necessary attorney's fees and costs of court in this matter.  Plaintiffs would show this Court that they have incurred reasonable and necessary attorney's fees and court costs in pursuing this matter.

15.     Attached and incorporated herein is the Affidavit of C.R. Lewis, with Exhibit "A" attached.

16.     Plaintiffs request the Court to set this matter for hearing to restrain temporarily the Defendant, Sklar Exploration Company, L.L.C.'s Notice of the Proposed Well, Johnson No. 1, L.M. Campbell Survey, Abstract 212, Cass County, Texas, until the Court has entered an Order or Final Judgment as to the operator of the prospect, and to do so before March 10, 2000.

Plaintiffs also request that the Court issue a Temporary Restraining Order and set this matter for Temporary Injunction to restrain the Defendant, Sklar-Tex, L.L.C. from acting as the operator of the Cass County Smackover Prospect, or from interfering with Borean Oil Company's actions as operator of the Cass County Smackover Prospect until further Orders of this Court or Judgment or an appropriate vote of the working interest owners.

Plaintiffs also request the Court to compel immediately the Defendants, Sklar Exploration Company, L.L.C. and Sklar-Tex, L.L.C. to mandatory arbitration, pursuant to the Agreement of the parties, and if necessary, the Court take such other actions as are appropriate to compel the arbitration agreement of the parties, and that the Court further Order that the arbitration occur within the next thirty days.

WHEREFORE, PREMISES CONSIDERED, Plaintiffs request this Court that service issue against the Defendants in this cause of action, and that an Order Setting Hearing on Temporary Injunction be issued, that Defendants show cause why this Court should not enjoin temporarily Sklar-Tex, L.L.C. from pursuing the proposed developmental well, Johnson No. 1, L.M. Campbell Survey, Abstract 212, Cass County, Texas, and that the Defendant, Sklar-Tex, L.L.C. be enjoined from acting as operator of the Cass County Smackover Prospect and from interfering with the operations of Borean Oil Company as the operator of the Cass County Smackover Prospect as defined by the Agreement of the parties, that the parties be ordered to arbitration and that it be completed within thirty days from the date of the Court's Order, that upon Final Hearing in this matter, that a Judgment be entered by this Court enjoining or abating the above-referenced act, and that upon final hearing herein, that this Court grant such Orders that are requested by the Parties with respect to the Agreement of the Parties and determination of arbitration, including but not limited to: 1) a determination that Sklar-Tex, L.L.C. has been removed as operator of the Cass County Smackover Prospect; 2.) that Borean Oil Company is the current operator of the Cass County Smackover Prospect; 3.) that Sklar-Tex, L.L.C. should be enjoined from interfering in any way with the operations of Borean Oil Company unless voted upon pursuant to the Agreement of the parties; 4) that the Plaintiffs be awarded attorney's fees from Defendants Sklar Exploration Company, L.L.C.

and Sklar-Tex, L.L.C., and such other and further relief as is necessary to effectuate Judgment of the

Court.

Respectfully submitted,

**SORRELL, ANDERSON, LEHRMAN,
MAHNER & RIDULFO, LLP**

ROBERT ANDERSON
Attorney at Law
Texas Bar No. 01220800
Federal Bar No. 5896
711 North Carancahua
American Bank Plaza, Suite 1200
Corpus Christi, Texas 78475
(361) 884-4981 Telephone
(361) 884-9618 Telecopier

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS

| | | |
|---|---|---|
| BOREAN OIL COMPANY, JON C. | § | |
| LEWIS, THOMAS R. LEWIS, DYER S. | § | |
| WADSWORTH, CASS COUNTY IRON | § | |
| COMPANY, AND JACK L. VAUGHN | § | |
| &ASSOCIATES, INC. | § | |
| | § | |
| vs. | § | CIVIL ACTION NO._____ |
| | § | |
| | § | |
| | § | |
| | § | |
| SKLAR EXPLORATION COMPANY, | § | |
| L.L.C., AND SKLAR-TEX, L.L.C. | § | |

## AFFIDAVIT OF C. R. LEWIS

**THE STATE OF TEXAS**    *

                         *

**COUNTY OF NUECES**    *

BEFORE ME, the undersigned authority, on this day personally appeared C. R. LEWIS, known to me to be the person whose name is subscribed herein, and after being duly sworn, on his oath deposed and says the following:

1.    "My name is C. R. Lewis. I am the Vice-President of Borean Oil Company.  I am over the age of twenty-one (21) and of sound mind. I have never been convicted of a crime. I am fully competent to make this Affidavit. The facts contained herein are true and correct and within my personal knowledge.

2.    Defendant Sklar-Tex, L.L.C. was the operator of an oil and gas prospect known as Cass County Smackover Prospect, Cass County, Texas, its affiliate entity, Sklar Exploration Company, L.L.C. is a working interest owner in the same prospect.

3.    A dispute has arisen between the working interest owners and the operator as to the right of the Defendant, Sklar-Tex, L.L.C. to continue as the operator.

4.    In June of 1999, all working interest owners entered into a Lease Purchase and Development

Agreement, Cass County Smackover Prospect, Cass County, Texas, (herein after referred to as the "Agreement") to develop the Cass County Smackover Prospect. Pursuant to the Agreement, Sklar-Tex, L.L.C. was appointed operator by all working interest owners.

5.  Subsequently, the operator terminated its relationship with a contract operator and its affiliated company proposed a developmental well.

6.  The majority of the working interest owners have given Sklar-Tex, L.L.C. notice of its removal as operator. The working interest owners who gave this notice and have joined in this action are Borean Oil Company, Jon C. Lewis, Thomas R. Lewis, Dyer S. Wadsworth, Cass County Iron Company, and Jack L. Vaughn & Associates, Inc. (63.17 percent of the working interest estate before payout. The prospect has not achieved payout).

7.  A majority of the working interest owners have chosen Borean Oil Company to act as operator.

8.  Sklar-Tex, L.L. C. has refused to acknowledge its removal as operator and the subsequent appointment of Borean Oil Company as operator by a majority of the working interest owners. Sklar-Tex, L.L.C. has asserted that it cannot be removed as operator unless it has "failed or refused to carry out its duties".

9.  The provisions of the Model Form Operating Agreement (Exhibit "C" to the Agreement), relied upon by Sklar-Tex, L.L.C., has been modified and is subject to the terms of the Agreement. The Agreement provides that the operator may be removed by "a vote of a majority interest of the working interest owners." The appointment of a successor operator is by an affirmative vote of two or more of the working interest owners owning a majority interest in the prospect.

10.  Plaintiffs have removed Sklar-Tex, L.L.C. by majority vote of the working interest owners and have selected Borean Oil Company as replacement operator by majority vote of the working interest owners.

11.  Sklar Exploration Company, L.L.C. has mailed to the Plaintiffs a proposal to drill the

Johnson No. 1 Well, L.M. Campbell Survey, Abstract 212, Cass County, Texas. The proposal was mailed on February 9, 2000. This Notice was given after Sklar-Tex, L.L.C. had been notified of its removal as operator. Any proposed well must be managed by the operator. Pursuant to the Agreement of the parties, the working interest owners have thirty (30) days to elect to participate or not participate in the new well. It is probable that conflicting positions will be taken by Sklar-Tex, L.L.C. and Borean Oil Company, resulting in irreparable harm or damage to the working interest owners and the prospect, including a determination of nonparticipation as to the proposed well. The Agreement does not provide for an immediate means of resolving this dispute by arbitration. The Agreement is clear from its four corners that a majority of the working interest owners may remove the operator, and shows it is probable that Plaintiffs will prevail at arbitration. If the Order is not granted, the Defendants can use the authority of the operator to adversely affect the Plaintiffs. It is in the public interest to see that written agreements and alternative means of dispute resolution can be used to effectuate a purpose.

12. The agreement between the parties provides that the parties may recover reasonable and necessary attorney's fees and costs of court in this matter.

13. Attached as Exhibit "A" herein is the Lease Purchase and Development Agreement, Cass County Smackover Prospect, Cass County, Texas with Exhibit "C" to said Agreement, the Model Form Operating Agreement.

**SIGNED** the 22 day of _February_____, 2000.

_____
C.R. LEWIS

SUBSCRIBED AND SWORN TO BEFORE ME on this the 22nd day of February 2000, to certify which witness my hand and official seal.

JO BETH COMBS
Notary Public
STATE OF TEXAS
My Comm. Exp. 09-16-2003

_____
NOTARY PUBLIC, STATE OF TEXAS

## LEASE PURCHASE AND DEVELOPMENT AGREEMENT

## CASS COUNTY SMACKOVER PROSPECT

## CASS COUNTY, TEXAS

THIS AGREEMENT, made and entered into effective the _2ⁿᵈ_ day of _____
____June_____, 19__ by and between BOREAN OIL COMPANY whose address
is Mercantile Tower 112, Suite 613, Corpus Christi, Texas 78477, hereinafter called
"Seller", and __Borean Oil Company, MT #112, Corpus Christi, Tex. 78477__ hereinafter
called "Buyer", and Sklar-Tex L.L.C. whose address is P.O. Box 1753, Shreveport,
Louisiana 71166-1753, hereinafter called "Operator", setting forth the terms and
conditions under which Seller has agreed to assign certain leasehold rights and
interests in the subject Cass County Smackover Prospect, hereinafter called
"Prospect," to Buyer and Buyer has agreed to acquire such interest and join in drilling a
well on such Prospect, all as hereinafter set forth.

### WITNESSETH

I.

Seller has represented and does hereby represent that Seller is the owner and
holder of certain oil and gas leases, hereinafter called "Lease", a list of which is
attached hereto as Exhibit "A", reference thereto being here made for all purposes.
Such Lease covers _3311.09_ gross acres, more or less, in Cass County, Texas. Seller
intends to sell off a portion of its interest in the Lease, retain a reduced interest, and
cause a test well to be drilled thereon.

II.

Seller has agreed to assign and does hereby agree to assign to Buyer, subject to
the further provisions of this Agreement, an undivided __eight percent__ (8%) of the
leasehold rights and interest granted to Seller under the terms of the above-described
Lease, subject to landowner royalties and overriding royalties as set forth in Exhibit "A".
Buyer will receive eight percent (8%) working interest in such Exhibit "A" leases. An
assignment of the interest which Seller has agreed to assign to Buyer, as above set
forth, will be recorded and delivered within a reasonable time after all leases comprising
the Lease have been recorded, and Buyer has performed all requirements herein to
fully earn such assignment.

III.

Buyer agrees to join in drilling its __eight percent__ (8%) share of one (1) test well
at a location of Seller's choice near the center of the leased acreage to a depth of
12,500 feet or a lesser depth sufficient to test the Smackover formation.  Seller will
designate Sklar-Tex L.L.C. as "Operator", who will serve in such capacity unless
removed through a vote of a majority in interest of working interest owners, or through
resignation.  Operator will contract for a commercial drilling company to drill the test
well, drilling cost to be for a turnkey well delivered by the drilling company, or a mutually

EXHIBIT "_____A_____"

acceptable alternative drilling contract. Operator will bill Buyer in advance, as more fully set out in Paragraph VI., for the estimated cost of preparing the location, paying the drilling contractor, and all other miscellaneous costs of drilling the test well, including such logs, cores, and tests deemed necessary by Operator to enable a decision to be made to either plug and abandon or attempt a completion, and an additional amount sufficient to cover the estimated cost of a completion attempt through the cementing of production casing in the hole. These funds will be placed by Operator in an escrow account or equivalent account, beyond the reach of Operator's creditors, interest bearing if practical, in an independent financial institution, to be released as and when needed for payment of expenses incurred. In the event that the well is plugged and abandoned, Operator will make final settlement with Buyer based on actual invoice costs up to that point. In the event that a completion is attempted and Buyer participates in the attempt, in the manner set forth in Paragraph XII., Operator will make final settlement with Buyer based on actual invoice costs up to that point. In the event mechanical problems are encountered in such well which make further work impractical or impossible, Buyer may at Buyer's option join in drilling a substitute well, in order to earn an interest in the Lease and additional acreage within the AMI (as defined in Paragraph IX.). The test well and any substitute well drilled therefor shall herein be referred to as the "Test Well". The Operator and the Seller and the Buyer agree that each will make good faith efforts to bring the Test Well, if successful, into commercial production as rapidly as may be feasible.

IV.

For each Subsequent Well drilled after the Test Well, Buyer will have the option to not participate on a well by well basis, for all or a portion of Buyers interest, but if Buyer elects to not participate then the participating parties will be allowed to recover 500% of their costs in the manner set forth in Article VI. B.2. of the Operating Agreement. Further, Operator may in its sole judgment require that Buyer prepay the estimated costs of drilling any Subsequent Well, in the manner set forth for the Test Well, and failure to make such prepayments within forty-five (45) days of written demand by Operator, will constitute an election by Buyer to not participate in such well.

V.

At any time after a successful completion of the Test Well, Operator may propose a seismic evaluation, 3-D or conventional, in an attempt to delineate the field. Should any of the working interest owners elect to go non-consent as to this operation participating parties may recover actual costs up to five hundred thousand dollars ($500,000.00) from all production established within the Prospect, but no well will have revenue diverted to pay for such seismic evaluation until that well has itself paid back from production the actual costs of drilling and completing such well.

VI.

For and in consideration of the assignment of such interest (Paragraph II.), Buyer agrees to pay the sum of  -PAID-   ($    ) to be paid on the effective date  of this Agreement at the time of signing, such sum to be paid by two checks, of equal amount,

-2-



one payable to M.A. Radley and one payable to C.R. Lewis, and an additional <u>seventy six thousand four hundred dollars</u> ($76,400), payable to Sklar-Tex L.L.C., and to be paid at the same time, to cover the estimated costs of drilling Buyer's __8__% share of the Test Well, as set out in Paragraph III., including that additional amount provided in Paragraph VII. Failure to make timely payment as above provided to either Seller or Operator shall be cause for terminating this Agreement, but Buyer shall suffer no further penalty for said failure. In the event that the Test Well has not been commenced within six (6) months from the date of this Agreement, Buyer may, by giving written notice to both Seller and Operator, withdraw from this Agreement and Seller and Operator will promptly refund all money paid by Buyer. In the event that the Test Well has not been commenced within three (3) years from the date of this Agreement, or if the Test Well has been drilled but commercial production has not been established by that time, this Agreement will terminate.

### VII.

As additional consideration for the assignment for such interest (Paragraph II.), Buyer agrees that Seller will have a "carried working interest" of five percent (5%) in addition to Sellers non-carried working interest, and Buyer agrees to pay its proportionate part of Seller's "carried working interest" costs in the drilling, completing and equipping of the Test Well, with Buyer allowed to recover 100% of such carried costs from Seller's "carried working interest" in the Test Well before Seller begins to receive working interest revenue from such interest. In like manner, Buyer will carry Seller's costs in the 5% "carried working interest" and recover such costs, in each Subsequent Well drilled by Buyer or its assigns on the Lease or any additional lease acreage acquired under the terms of the Area of Mutual Interest (Paragraph IX.). Seller will pay its proportionate share of its non-carried working interest costs in the same manner as Buyer.

### VIII.

Seller has agreed and does hereby agree to furnish Buyer with copies of the leases and /or access to the leases in Seller's office, together with any and all title information, delay rental receipts, title opinion (if any), geological information (a package clearly setting forth the geological information will be furnished to Buyer) and any and all other information which they possess with respect to such leases. If, before the Test Well is drilled, title defect is discovered on the Lease which would preclude the drilling of a well thereon by a reasonably prudent operator, then Buyer shall be released from all rights and obligations under this Agreement and Seller and Operator shall promptly refund the purchase price and advanced drilling costs to Buyer, if Buyer makes timely written request for such release and refund.

### IX.

An Area of Mutual Interest (AMI) shall exist within the boundaries shown on Exhibit "B", and such boundaries will constitute the boundaries of the Prospect for all relevant purposes. Within this AMI any additional leased acreage acquired by Buyer or Seller shall be offered at cost to all other owners in their respective proportions, except



that an overriding royalty of two percent (2%) each will be delivered to Petrominex, Inc. and to Seller.  The AMI shall exist until the expiration date of the primary term of the last existing lease acquired before the completion of the initial Test Well or the date of last production from the last producing well which includes land or lands pooled therewith which lie within the boundary of the AMI, and thereafter terminate.

X.

It is understood that the existing Lease acreage is sufficient to support the drilling of the Test Well.  Additional acreage may be purchased before or after the Test Well is drilled, depending upon the judgment of Operator, with the advice of other working interest owners.  Parties to the Agreement may elect to join or not join in additional lease purchases; those electing to join must make purchase payments within thirty (30) days of written demand or lose their participation in the subject additional lease.

XI.

Buyer or Buyer's representatives at their sole risk shall have access at all times to the derrick floor of the Test Well (and any Subsequent Well), and any and all information obtained or developed in connection with the drilling, logging, evaluating, testing and operating of the Test Well (and any Subsequent Well) will be timely furnished to Buyer.   Operator agrees to furnish daily reports by telephone or telefacsimile followed by mail to Buyer's office at the above address, covering the preceding 24 hours, advising of the shows of oil and /or gas encountered and the results of all testing operations and agrees to furnish Buyer with timely notice prior to logging or testing so that Buyer or Buyer's representatives may be present for such operations.  Buyer will have twenty-four hours (24 hrs.)  to make an election after Operator has made a bona fide effort to communicate a recommendation to either plug and abandon the Test Well (and any Subsequent Well) or attempt a completion.  If no election is made, Buyer will be deemed to have joined in Operator's recommendation. If Buyer elects not to participate in a completion attempt of the Test Well, then Buyer's interest in the Lease and any new leases and rights under this Agreement are permanently relinquished to the participating parties.  If Buyer does elect to participate in a completion attempt of the Test Well, but is unable to pay the additional completion costs beyond those pre-paid under Paragraphs III. and VI., then failure to pay such additional completion costs upon demand will constitute an election to allow the paying parties to recover 500% of such costs in the manner set forth in Article VII.D.I. Option No. 2 of the Operating Agreement.  If Buyer elects not to participate in a completion attempt of any Subsequent Well, then the participating parties will be allowed to recover 500% of their costs in the manner set forth in Article VII. D.1. Option No. 2, of the Operating Agreement.

XII.

Attached hereto and made a part hereof as Exhibit "C" is an Operating Agreement which will govern all operations on the Lease and any new leases acquired under this Agreement, except as to those operations expressly provided for in this

-4-



Agreement.   In the event that there is a conflict between this Agreement and the Operating Agreement, then this Agreement shall control.

### XIII.

This Agreement does not constitute or create nor shall it be construed to constitute or create a partnership, mineral or otherwise, or a fiduciary or agency relationship of any kind or character whereby any of the parties hereto shall become liable for the acts and deeds of any other party hereto.

### XIV.

The rights, titles and interest of each party hereto shall be fully transferable and assignable, in whole or in part; provided, however, that the provisions of this Agreement shall extend to and be binding upon the parties hereto, their respective heirs, administrators, executors, successors and/or assigns.   It is provided however that if Buyer does transfer or assign an interest at any time before five (5) wells have been drilled within the AMI, or before two years have passed from the date of this Agreement, whichever comes first, Operator may require that Buyer designate a single individual to receive all notices and make all elections for the full interest originally held by Buyer, during this period.

### XV.

This Agreement may be amended by consent of all parties hereto.

IN WITNESS WHEREOF, this instrument is executed effective as of the day first written above, and must be executed by all parties indicated before becoming effective as to any party.

OPERATOR:
Sklar-Tex L.L.P.

By: _____
    Vice President

SELLER:
BOREAN OIL COMPANY

By: _____
    C.R. Lewis,
    Vice President

BUYER:

BOREAN OIL COMPANY

By: _____

Exhibit "A"
LEASE PURCHASE AND DEVELOPMENT AGREEMENT
CASS COUNTY SMACKOVER PROSPECT
CASS COUNTY, TEXAS

| LEASE | GROSS ACRES | NET ACRES | EXPIRES | NET INTEREST TO BUYER AFTER ROYALTIES & OVERRIDING ROYALTIES |
|---|---|---|---|---|
| Cass County Iron Co | 971.43 | 971.43 | 7/31/00 | 80% |
| E. H. & J. Wiley | 78.93 | 78.93 | 7/9/00 | 80% |
| Mary Hurt | 6.07 | 6.07 | 7/21/00 | 80% |
| SIDCO Minerals | 55.50 | 55.5 | 7/9/00 | 80% |
| Steven Secord | 39.70 | 19.85 | 2/6/01 | 83.5% |
| C. R. Adams | 304.06 | 76.01 | 11/19/00 | 83.5% |
| R. R. Middleton | " | 76.01 | 11/19/00 | 83.5% |
| Mary C. Pate | 16.00 | 16.00 | 10/10/00 | 83.5% |
| Buddy D. Pate | 25.00 | 25.00 | 9/30/00 | 83.5% |
| K.L. & L.C. Pate | 52.00 | 52.00 | 9/26/00 | 83.5% |
| T.D. & Kim Sutton | 20.00 | 10.00 | 10/3/00 | 83.5% |
| B.J. & R.R. Toombs | 127.96 | 127.96 | 12/22/01 | 83.5% |
| D. Anderson | 7.765 | 7.765 | 3/26/04 | 83.5% |
| L.G. Anderson | 37.215 | 37.215 | 3/18/04 | 83.5% |
| C.E. Cargile | 49.5 | 24.75 | 3/8/04 | 83.5% |
| F.L. Livingston | 50.0 | 5.00 | 3/5/04 | 83.5% |
| D.W. Stewart | 63.5 | 10.5833 | | 77.25% |
| S.S. Mann | " | 10.5833 | | 77.25% |
| S.L. Stewart | " | 10.5833 | | 77.25% |
| R.G. Hummel | 60.543 | 30.2715 | | 83.5% |
| R.T. Addington | 62.5 | 7.8125 | | 83.5% |
| A.L. Bergner | " | 7.8125 | | 77.25% |
| F.L. Shimmel | " | 7.8125 | | 77.25% |
| O.H. Jenkins | 95.533 | 4.09428 | | 83.5% |
| J. H. Conway | | 4.09428 | | 83.5% |
| M. Allison | " | 2.72952 | | 83.5% |
| L. Gilbert | " | 2.72952 | | 83.5% |
| E.W. Hamilton | " | 6.8238 | | 83.5% |
| S.H. Lollar | " | 0.68238 | | 83.5% |
| D. Hamilton | " | 0.68238 | | 83.5% |
| C.H. Echols | " | 8.18856 | | 83.5% |
| M.W. Young | " | 4.09428 | | 83.5% |
| W.R. Nichols | 404.058 | 41.501 | | 83.5% |
| W.R. Nichols, III | " | 41.501 | | 83.5% |
| J.S. Nichols | " | 41.501 | | 83.5% |
| M.B. Nichols | " | 62.251 | | 83.5% |
| R.R. Middleton | 100.0 | 25.0 | | 83.5% |
| C.R. Adams | " | 25.0 | | 83.5% |
| J. C. Dearman | 78.0 | 13.0 | | 79% |
| M. Edwards | " | 4.333 | | 79% |
| M. E. Hill | " | 4.333 | | 79% |
| S. Puckett | " | 4.333 | | 79% |
| B. L. Mayfield | 79.54 | 2.8407 | | 79% |
| C. Sebulsky | " | 2.8407 | | 79% |
| G. Jones | " | 17.0443 | | 79% |
| J. Allen | " | 5.6814 | | 79% |
| C. T. Cowgill | " | 2.8407 | | 79% |
| V.C. DeLong | " | 2.8407 | | 79% |
| J.W. & V.W. Hall | 103.42 | 103.42 | | 78% |
| N. R. Cook | 39.77 | 19.885 | | 79% |
| H. A. Hammock | 163.50 | 122.625 | | 75.5% |
| V. Hall | " | 40.875 | | 79% |

Page 1 of 2

CVISPDF – www.fastio.com

**Exhibit "A"**
**LEASE PURCHASE AND DEVELOPMENT AGREEMENT**
**CASS COUNTY SMACKOVER PROSPECT**
**CASS COUNTY, TEXAS**

| LEASE | GROSS ACRES | NET ACRES | EXPIRES | NET INTEREST TO BUYER AFTER ROYALTIES & OVERRIDING ROYALTIES |
|---|---|---|---|---|
| C. R. & K. Johnson | 113.5 | 105.1667 | | 79% |
| K. McCutchan | 5.5 (?) | 5.5 (?) | | 79% |
| J. E. Beard | 50.00 | 8.333 | | 79% |
| W. B. & L. Surratt | 50.60 | 25.3 | | 79% |
| Total | 3311.094 | 2437.01 | | |

Acreage shown, both gross and net, is for lease identification purposes only and does not imply that the numbers shown are true and correct. The Agreement to which this Exhibit "A" is attached is not dependent upon a perfect recital of such acreage, and payments are not dependent upon acreage, but are instead a fixed amount, wherever enumerated. Title defects are addressed in Paragraph VIII. of the Agreement. The leases shown are those used to calculate the payments required under this Agreement. Also included in this Exhibit "A" are any other leases that may be owned by Borean Oil Company within the AMI at the effective date of this Agreement, including leases held in the name of Sklar Exploration Company which have not yet been assigned to Borean Oil Company. Any such leases will be subject to the overriding royalties set out in Paragraph IX. of this Agreement and subject to reimbursement of acquisition costs. Any further leases, bought by or on behalf of Borean Oil Company after the effective date of this Agreement, will be treated as set out in Paragraph IX. of this Agreement. In the event that the NET INTEREST TO BUYER AFTER ROYALTIES AND OVERRIDING ROYALTIES is incorrectly calculated in this Exhibit "A," the correct calculation shall control according to this formula: On the Cass County Iron Co., E.H. And J. Wiley, Mary Hurt, and SIDCO Minerals leases, the Royalties and Overriding Royalties total twenty percent (20%); on all other leases the Overriding Royalty burden is four percent (4%), except those obtained by purchase from Trans-Texas Resources, Inc.,where the additional Overriding Royalty burden is two percent (2%).

Page 2 of 2

### Exhibit "B"
### LEASE PURCHASE AND DEVELOPMENT AGREEMENT
### CASS COUNTY SMACKOVER PROSPECT
### CASS COUNTY, TEXAS



**EXHIBIT "C"**
**LEASE PURCHASE AND DEVELOPMENT AGREEMENT**
**CASS COUNTY SMACKOVER PROSPECT**
**CASS COUNTY, TEXAS**

Exhibit "C" will be a  MODEL FORM OPERATING AGREEMENT based on
A.A.P.L. Form 610-1982 with reasonable and customary provisions, and
provided with an ACCOUNTING PROCEDURE, JOINT OPERATIONS, based
on the COPAS - 1984 - ONSHORE form.

CutePDF - www.texiso.com

EXHIBIT "C"

Attached to and made a part of that certain Lease Purchase and Development Agreement between Sklar-Tex L.L.C., as Operator and Non-Operators covering the Cass County Prospect.

A.A.P.L. FORM 610-1982

# MODEL FORM OPERATING AGREEMENT

Use of this imprinting mark is prohibited except when authorized in writing by the American Association of Petroleum Landmen

OPERATING AGREEMENT

DATED

May 28 , 19 99 ,

OPERATOR   SKLAR-TEX L.L.C.

CONTRACT AREA   as shown on Exhibit A-1

COUNTY OR PARISH OF   Cass   STATE OF Texas

COPYRIGHT 1982  —  ALL RIGHTS RESERVED
AMERICAN ASSOCIATION OF PETROLEUM
LANDMEN, 2408 CONTINENTAL LIFE BUILDING,
FORT WORTH, TEXAS, 76102, APPROVED FORM.
A.A.P.L.  NO.  610 - 1982  REVISED

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

## GUIDANCE IN THE PREPARATION OF THIS AGREEMENT:

1. <u>Title Page</u> - Fill in blanks as applicable.

2. <u>Preamble, Page 1</u> - Enter name of Operator.

3. <u>Article II - Exhibits:</u>
   (a) Indicate Exhibits to be attached.
   (b) If it is desired that no reference be made to non-discrimination, the reference to Exhibit "F" should be deleted.

4. <u>Article III.B. - Interests of Parties in Costs and Production</u> - Enter royalty fraction as agreed to by parties.

5. <u>Article IV.A. - Title Examination</u> - Select option as agreed to by the parties.

6. <u>Article IV.B. - Loss of Title</u> - If "Joint Loss" of Title is desired, the following changes should be made:
   (a) Delete Articles IV.B.1 and IV.B.2.
   (b) Article IV.B.3 - Delete phrase "other than those set forth in Articles IV.B.1 and IV.B.2 above."
   (c) Article VII.E. - Change reference at end of the first grammatical paragraph from "Article IV.B.2" to "Article IV.B.3."
   (d) Article X. - Add as the concluding sentence - "All claims or suits involving title to any interest subject to this agreement shall be treated as a claim or a suit against all parties hereto."

7. <u>Article V - Operator</u> - Enter name of Operator.

8. <u>Article VI.A - Initial Well:</u>
   (a) Date of commencement of drilling.
   (b) Location of well.
   (c) Obligation depth.

9. <u>Article VI.B.2.(b) - Subsequent Operations</u> - Enter penalty percentage as agreed to by parties.

10. <u>Article VI.C. - Taking Production in Kind</u> - If a Gas Balancing Agreement is not in existence nor attached hereto as Exhibit "E", then use Alternate Page 8.

11. <u>Article VII.D.1. - Limitation of Expenditures</u> - Select option as agreed to by parties.

12. <u>Article VII.D.3. - Limitation of Expenditures</u> - Enter limitation of expenditure of Operator for single project and amount above which Operator may furnish information AFE.

13. <u>Article IX. - Internal Revenue Code Election</u> - Delete this article in the event the agreement is a Tax Partnership and Exhibit "G" is attached.

14. <u>Article X. - Claims and Lawsuits</u> - Enter claim limit as agreed to by parties.

15. <u>Article XIII. - Term of Agreement:</u>
    (a) Select Option as agreed to by parties.
    (b) If Option No. 2 is selected, enter agreed number of days in two (2) blanks.

16. <u>Article XIV.B - Governing Law</u> - Enter state as agreed to by parties.

17. <u>Signature Page</u> - Enter effective date.



Use of this identifying mark is prohibited except when authorized in writing by the American Association of Petroleum Landmen

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

# TABLE OF CONTENTS

| Article | Title | Page |
|---|---|---|
| I. | DEFINITIONS | 1 |
| II. | EXHIBITS | 1 |
| III. | INTERESTS OF PARTIES | 2 |
| | A. OIL AND GAS INTERESTS | 2 |
| | B. INTERESTS OF PARTIES IN COSTS AND PRODUCTION | 2 |
| | C. EXCESS ROYALTIES, OVERRIDING ROYALTIES AND OTHER PAYMENTS | 2 |
| | D. SUBSEQUENTLY CREATED INTERESTS | 2 |
| IV. | TITLES | 2 |
| | A. TITLE EXAMINATION | 2-3 |
| | B. LOSS OF TITLE | 3 |
| | 1. Failure of Title | 3 |
| | 2. Loss by Non-Payment or Erroneous Payment of Amount Due | 3 |
| | 3. Other Losses | 3 |
| V. | OPERATOR | 4 |
| | A. DESIGNATION AND RESPONSIBILITIES OF OPERATOR | 4 |
| | B. RESIGNATION OR REMOVAL OF OPERATOR AND SELECTION OF SUCCESSOR | 4 |
| | 1. Resignation or Removal of Operator | 4 |
| | 2. Selection of Successor Operator | 4 |
| | C. EMPLOYEES | 4 |
| | D. DRILLING CONTRACTS | 4 |
| VI. | DRILLING AND DEVELOPMENT | 4 |
| | A. INITIAL WELL | 4-5 |
| | B. SUBSEQUENT OPERATIONS | 5 |
| | 1. Proposed Operations | 5 |
| | 2. Operations by Less than All Parties | 5-6-7 |
| | 3. Stand-By Time | 7 |
| | 4. Sidetracking | 7 |
| | C. TAKING PRODUCTION IN KIND | 7 |
| | D. ACCESS TO CONTRACT AREA AND INFORMATION | 8 |
| | E. ABANDONMENT OF WELLS | 8 |
| | 1. Abandonment of Dry Holes | 8 |
| | 2. Abandonment of Wells that have Produced | 8-9 |
| | 3. Abandonment of Non-Consent Operations | 9 |
| VII. | EXPENDITURES AND LIABILITY OF PARTIES | 9 |
| | A. LIABILITY OF PARTIES | 9 |
| | B. LIENS AND PAYMENT DEFAULTS | 9 |
| | C. PAYMENTS AND ACCOUNTING | 9 |
| | D. LIMITATION OF EXPENDITURES | 9-10 |
| | 1. Drill or Deepen | 9-10 |
| | 2. Rework or Plug Back | 10 |
| | 3. Other Operations | 10 |
| | E. RENTALS, SHUT-IN WELL PAYMENTS AND MINIMUM ROYALTIES | 10 |
| | F. TAXES | 10 |
| | G. INSURANCE | 11 |
| VIII. | ACQUISITION, MAINTENANCE OR TRANSFER OF INTEREST | 11 |
| | A. SURRENDER OF LEASES | 11 |
| | B. RENEWAL OR EXTENSION OF LEASES | 11 |
| | C. ACREAGE OR CASH CONTRIBUTIONS | 11-12 |
| | D. MAINTENANCE OF UNIFORM INTEREST | 12 |
| | E. WAIVER OF RIGHTS TO PARTITION | 12 |
| | F. PREFERENTIAL RIGHT TO PURCHASE | 12 |
| IX. | INTERNAL REVENUE CODE ELECTION | 12 |
| X. | CLAIMS AND LAWSUITS | 13 |
| XI. | FORCE MAJEURE | 13 |
| XII. | NOTICES | 13 |
| XIII. | TERM OF AGREEMENT | 13 |
| XIV. | COMPLIANCE WITH LAWS AND REGULATIONS | 14 |
| | A. LAWS, REGULATIONS AND ORDERS | 14 |
| | B. GOVERNING LAW | 14 |
| | C. REGULATORY AGENCIES | 14 |
| XV. | OTHER PROVISIONS | 14 |
| XVI. | MISCELLANEOUS | 14 |

Use of this identical part is prohibited reprint is allowed without the written by the American Association of Petroleum Landmen.

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

## OPERATING AGREEMENT

THIS AGREEMENT, entered into by and between  SKLAR-TEX L.L.C.

_____ hereinafter designated and referred to as "Operator", and the signatory party or parties other than Operator, sometimes hereinafter referred to individually herein as "Non-Operator", and collectively as "Non-Operators".

### WITNESSETH:

WHEREAS, the parties to this agreement are owners of oil and gas leases and/or oil and gas interests in the land identified in Exhibit "A", and the parties hereto have reached an agreement to explore and develop these leases and/or oil and gas interests for the production of oil and gas to the extent and as hereinafter provided,

NOW, THEREFORE, it is agreed as follows:

### ARTICLE I.
### DEFINITIONS

As used in this agreement, the following words and terms shall have the meanings here ascribed to them:

A. The term "oil and gas" shall mean oil, gas, casinghead gas, gas condensate, and all other liquid or gaseous hydrocarbons and other marketable substances produced therewith, unless an intent to limit the inclusiveness of this term is specifically stated.

B. The terms "oil and gas lease", "lease" and "leasehold" shall mean the oil and gas leases covering tracts of land lying within the Contract Area which are owned by the parties to this agreement.

C. The term "oil and gas interests" shall mean unleased fee and mineral interests in tracts of land lying within the Contract Area which are owned by parties to this agreement.

D. The term "Contract Area" shall mean all of the lands, oil and gas leasehold interests and oil and gas interests intended to be developed and operated for oil and gas purposes under this agreement. Such lands, oil and gas leasehold interests and oil and gas interests are described in Exhibit "A".

E. The term "drilling unit" shall mean the area fixed for the drilling of one well by order or rule of any state or federal body having authority. If a drilling unit is not fixed by any such rule or order, a drilling unit shall be the drilling unit as established by the pattern of drilling in the Contract Area or as fixed by express agreement of the Drilling Parties.

F. The term "drillsite" shall mean the oil and gas lease or interest on which a proposed well is to be located.

G. The terms "Drilling Party" and "Consenting Party" shall mean a party who agrees to join in and pay its share of the cost of any operation conducted under the provisions of this agreement.

H. The terms "Non-Drilling Party" and "Non-Consenting Party" shall mean a party who elects not to participate in a proposed operation.

Unless the context otherwise clearly indicates, words used in the singular include the plural, the plural includes the singular, and the neuter gender includes the masculine and the feminine.

### ARTICLE II.
### EXHIBITS

The following exhibits, as indicated below and attached hereto, are incorporated in and made a part hereof:

☒ A. Exhibit "A", shall include the following information:
    (1) Identification of lands subject to this agreement,
    (2) Restrictions, if any, as to depths, formations, or substances,
    (3) Percentages or fractional interests of parties to this agreement,
    (4) Oil and gas leases and/or oil and gas interests subject to this agreement,
    (5) Addresses of parties for notice purposes.

☐ B. Exhibit "B", Form of Lease.
☒ C. Exhibit "C", Accounting Procedure.
☒ D. Exhibit "D", Insurance.
☒ E. Exhibit "E", Gas Balancing Agreement.
☐ F. Exhibit "F", Non-Discrimination and Certification of Non-Segregated Facilities.
☐ G. Exhibit "G", Tax Partnership.

If any provision of any exhibit, except Exhibits "E" and "G", is inconsistent with any provision contained in the body of this agreement, the provisions in the body of this agreement shall prevail.

Use of this identifying mark is prohibited except when authorized in writing by the American Association of Petroleum Landmen

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

## ARTICLE III.
### INTERESTS OF PARTIES

**A. Oil and Gas Interests:**

If any party owns an oil and gas interest in the Contract Area, that interest shall be treated for all purposes of this agreement and during the term hereof as if it were covered by the form of oil and gas lease attached hereto as Exhibit "B", and the owner thereof shall be deemed to own both the royalty interest reserved in such lease and the interest of the lessee thereunder.

**B. Interests of Parties in Costs and Production:**

Unless changed by other provisions, all costs and liabilities incurred in operations under this agreement shall be borne and paid, and all equipment and materials acquired in operations on the Contract Area shall be owned, by the parties as their interests are set forth in Exhibit "A". In the same manner, the parties shall also own all production of oil and gas from the Contract Area subject to the payment of royalties to the extent of _lessor lease burdens_ which shall be borne as hereinafter set forth.

Regardless of which party has contributed the lease(s) and/or oil and gas interest(s) hereto on which royalty is due and payable, each party entitled to receive a share of production of oil and gas from the Contract Area shall pay or deliver, or cause to be paid or delivered, to the extent of its interest in such production, the royalty amount stipulated hereinabove and shall hold the other parties free from any liability therefor. No party shall ever be responsible, on a price basis higher than the price received by such party, to any other party's lessor or royalty owner, and if any such other party's lessor or royalty owner should demand and receive settlement on a higher price basis, the party contributing the affected lease shall bear the additional royalty burden attributable to such higher price.

Nothing contained in this Article III.B. shall be deemed an assignment or cross-assignment of interests covered hereby.

**C. Excess Royalties, Overriding Royalties and Other Payments:**

Unless changed by other provisions, if the interest of any party in any lease covered hereby is subject to any royalty, overriding royalty, production payment or other burden on production in excess of the amount stipulated in Article III.B., such party so burdened shall assume and alone bear all such excess obligations and shall indemnify and hold the other parties hereto harmless from any and all claims and demands for payment asserted by owners of such excess burden.

**D. Subsequently Created Interests:**

If any party should hereafter create an overriding royalty, production payment or other burden payable out of production attributable to its working interest hereunder, or if such a burden existed prior to this agreement and is not set forth in Exhibit "A", or was not disclosed in writing to all other parties prior to the execution of this agreement by all parties, or is not a jointly acknowledged and accepted obligation of all parties (any such interest being hereinafter referred to as "subsequently created interest" irrespective of the timing of its creation and the party out of whose working interest the subsequently created interest is derived being hereinafter referred to as "burdened party"), and:

    1. If the burdened party is required under this agreement to assign or relinquish to any other party, or parties, all or a portion of its working interest and/or the production attributable thereto, said other party, or parties, shall receive said assignment and/or production free and clear of said subsequently created interest and the burdened party shall indemnify and save said other party, or parties, harmless from any and all claims and demands for payment asserted by owners of the subsequently created interest; and,

    2. If the burdened party fails to pay, when due, its share of expenses chargeable hereunder, all provisions of Article VII.B. shall be enforceable against the subsequently created interest in the same manner as they are enforceable against the working interest of the burdened party.

## ARTICLE IV.
### TITLES

**A. Title Examination:**

Title examination shall be made on the drillsite of any proposed well prior to commencement of drilling operations or, if the Drilling Parties so request, title examination shall be made on the leases and/or oil and gas interests included, or planned to be included, in the drilling unit around such well. The opinion will include the ownership of the working interest, minerals, royalty, overriding royalty and production payments under the applicable leases. At the time a well is proposed, each party contributing leases and/or oil and gas interests to the drillsite, or to be included in such drilling unit, shall furnish to Operator all abstracts (including federal lease status reports), title opinions, title papers and curative material in its possession free of charge. All such information not in the possession of or made available to Operator by the parties, but necessary for the examination of the title, shall be obtained by Operator. Operator shall cause title to be examined by attorneys on its staff or by outside attorneys. Copies of all title opinions shall be furnished to each party hereto. The cost incurred by Operator in this title program shall be borne as follows:

~~☐ Option No. 1: Costs incurred by Operator in procuring abstracts and title examination (including preliminary, supplemental, shut-in gas royalty opinions and division order title opinions) shall be a part of the administrative overhead as provided in Article I and shall not be a direct charge, whether performed by Operator's staff attorneys or by outside attorneys.~~

Case 2:00-cv-00074   Document 1   Filed in TXSD on 02/22/2000   Page 24 of 62

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

## ARTICLE IV
### continued                    *                    **

1  ☒  Option No. 2: Costs incurred by Operator in procuring abstracts and fees paid outside attorneys for title examination
2  (including preliminary, supplemental, shut-in gas royalty opinions and division order title opinions) shall be borne by the Drilling Parties
3  in the proportion that the interest of each Drilling Party bears to the total interest of all Drilling Parties as such interests appear in Ex-
4  hibit "A". Operator shall make no charge for services rendered by its staff attorneys or other personnel in the performance of the above
5  functions.

6      Operator shall use its best efforts to secure
7      ~~Each party shall be responsible for securing~~ curative matter and pooling amendments or agreements required in connection
   and reflect the same expense and charge to the joint account as abov
8  with leases or oil and gas interests contributed by such party. ~~Operator shall be responsible for the preparation and recording or pooling~~
9  designations or declarations as well as the conduct of hearings before governmental agencies for the securing of spacing or pooling orders.
10 This shall not prevent any party from appearing on its own behalf at any such hearing.

11

12     No well shall be drilled on the Contract Area until after (1) the title to the drillsite or drilling unit has been examined as above
13 provided, and (2) the title has been approved by the examining attorney or title has been accepted by ~~all of the parties who are to par-~~  Operator
14 ~~ticipate in the drilling of the well.~~

15

16 B.  Loss of Title:

17

18 ~~1. Failure of Title: Should any oil and gas interest or lease, or interest therein, be lost through failure of title, which loss results in a~~
19 ~~reduction of interest from that shown on Exhibit "A", the party contributing the affected lease or interest shall have ninety (90) days~~
20 ~~from final determination of title failure to acquire a new lease or other instrument curing the entirety of the title failure, which acquisi-~~
21 ~~tion will not be subject to Article VIII.B., and failing to do so, this agreement, nevertheless, shall continue in force as to all remaining oil~~
22 ~~and gas leases and interests: and,~~

23 ~~(a) The party whose oil and gas lease or interest is affected by the title failure shall bear alone the entire loss and it shall not be~~
24 ~~entitled to recover from Operator or the other parties any development or operating costs which it may have theretofore paid or incurred,~~
25 ~~but there shall be no additional liability on its part to the other parties hereto by reason of such title failure;~~

26 ~~(b) There shall be no retroactive adjustment of expenses incurred or revenues received from the operation of the interest which has~~
27 ~~been lost, but the interests of the parties shall be revised on an acreage basis, as of the time it is determined finally that title failure has oc-~~
28 ~~curred, so that the interest of the party whose lease or interest is affected by the title failure will thereafter be reduced in the Contract~~
29 ~~Area by the amount of the interest lost;~~

30 ~~(c) If the proportionate interest of the other parties hereto in any producing well theretofore drilled on the Contract Area is~~
31 ~~increased by reason of the title failure, the party whose title has failed shall receive the proceeds attributable to the increase in such in-~~
32 ~~terest (less costs and burdens attributable thereto) until it has been reimbursed for unrecovered costs paid by it in connection with such~~
33 ~~well;~~

34 ~~(d) Should any person not a party to this agreement, who is determined to be the owner of any interest in the title which has~~
35 ~~failed, pay in any manner any part of the cost of operation, development, or equipment, such amount shall be paid to the party or parties~~
36 ~~who bore the costs which are so refunded;~~

37 ~~(e) Any liability to account to a third party for prior production of oil and gas by reason of title failure shall be~~
38 ~~borne by the party or parties whose title failed in the same proportions in which they shared in such prior production; and,~~

39 ~~(f) No charge shall be made to the joint account for legal expenses, fees or salaries, in connection with the defense of the interest~~
40 ~~claimed by any party hereto, it being the intention of the parties hereto that each shall defend title to its interest and bear all expenses in~~
41 ~~connection therewith.~~

42

43 ~~2. Loss by Non-Payment or Erroneous Payment of Amount Due: If, through mistake or oversight, any rental, shut-in well~~
44 ~~payment, minimum royalty or royalty payment, is not paid or it erroneously paid, and as a result a lease or interest therein terminates,~~
45 ~~there shall be no monetary liability against the party who failed to make such payment. Unless the party who failed to make the required~~
46 ~~payment secures a new lease covering the same interest within ninety (90) days from the discovery of the failure to make proper payment,~~
47 ~~which acquisition will not be subject to Article VIII.B., the interests of the parties shall be revised on an acreage basis, effective as of the~~
48 ~~date of termination of the lease involved, and the party who failed to make proper payment will no longer be credited with an interest in~~
49 ~~the Contract Area on account of ownership of the lease or interest which has terminated. In the event the party who failed to make the~~
50 ~~required payment shall not have been fully reimbursed, at the time of the loss, from the proceeds of the sale of oil and gas attributable to~~
51 ~~the lost interest, calculated on an acreage basis, for the development and operating costs theretofore paid on account of such interest, it~~
52 ~~shall be reimbursed for unrecovered actual costs theretofore paid by it (but not for its share of the cost of any dry hole previously drilled~~
53 ~~or wells previously abandoned) from so much of the following as is necessary to effect reimbursement:~~

54 ~~(a) Proceeds of oil and gas, less operating expenses, theretofore accrued to the credit of the lost interest, on an acreage basis,~~
55 ~~up to the amount of unrecovered costs;~~

56 ~~(b) Proceeds, less operating expenses, thereafter accrued attributable to the lost interest on an acreage basis, of that portion of~~
57 ~~oil and gas thereafter produced and marketed (excluding production from any wells thereafter drilled) which, in the absence of such lease~~
58 ~~termination, would be attributable to the lost interest on an acreage basis, up to the amount of unrecovered costs; the proceeds of said~~
59 ~~portion of the oil and gas to be contributed by the other parties in proportion to their respective interests; and,~~

60 ~~(c) Any monies, up to the amount of unrecovered costs, that may be paid by any party who is, or becomes, the owner of the interest~~
61 ~~lost, for the privilege of participating in the Contract Area or becoming a party to this agreement.~~

62                                                                                                   All
63 3. ~~Other~~ Losses: All losses incurred, ~~other than those set forth in Articles IV.B.1. and IV.B.2. above,~~ shall be joint losses
64 and shall be borne by all parties in proportion to their interests. There shall be no readjustment of interests in the remaining portion of
65 the Contract Area.

66     * curative matters and materials
67    ** landmen and consultants
68   *** and applications and hearings

69

70

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

ARTICLE V.

OPERATOR

A.  Designation and Responsibilities of Operator:

SKLAR-TEX L.L.C._____shall be the
Operator of the Contract Area, and shall conduct and direct and have full control of all operations on the Contract Area as permitted and
required by, and within the limits of this agreement. It shall conduct all such operations in a good and workmanlike manner, but it shall
have no liability as Operator to the other parties for losses sustained or liabilities incurred, except such as may result from gross
negligence or willful misconduct.

B.  Resignation or Removal of Operator and Selection of Successor:

1.  Resignation or Removal of Operator: Operator may resign at any time by giving written notice thereof to Non-Operators.
If Operator terminates its legal existence, no longer owns an interest hereunder in the Contract Area, or is no longer capable of serving as
Operator, Operator shall be deemed to have resigned without any action by Non-Operators, except the selection of a successor. Operator
may be removed if it fails or refuses to carry out its duties hereunder, or becomes insolvent, bankrupt or is placed in receivership, by the
affirmative vote of two (2) or more Non-Operators owning a majority interest based on ownership as shown on Exhibit "A" remaining
after excluding the voting interest of Operator. Such resignation or removal shall not become effective until 7:00 o'clock A.M. on the
first day of the calendar month following the expiration of ninety (90) days after the giving of notice of resignation by Operator or action
by the Non-Operators to remove Operator, unless a successor Operator has been selected and assumes the duties of Operator at an earlier
date. Operator, after effective date of resignation or removal, shall be bound by the terms hereof as a Non-Operator. A change of a cor-
porate name or structure of Operator or transfer of Operator's interest to any single subsidiary, parent or successor corporation shall not
be the basis for removal of Operator.

2.  Selection of Successor Operator: Upon the resignation or removal of Operator, a successor Operator shall be selected by
the parties. The successor Operator shall be selected from the parties owning an interest in the Contract Area at the time such successor
Operator is selected. The successor Operator shall be selected by the affirmative vote of two (2) or more parties owning a majority interest
based on ownership as shown on Exhibit "A"; provided, however, if an Operator which has been removed fails to vote or votes only to
succeed itself, the successor Operator shall be selected by the affirmative vote of two (2) or more parties owning a majority interest based
on ownership as shown on Exhibit "A" remaining after excluding the voting interest of the Operator that was removed.

C.  Employees:

The number of employees used by Operator in conducting operations hereunder, their selection, and the hours of labor and the
compensation for services performed shall be determined by Operator, and all such employees shall be the employees of Operator.

D.  Drilling Contracts:

All wells drilled on the Contract Area shall be drilled on a competitive contract basis at the usual rates prevailing in the area. If it so
desires, Operator may employ its own tools and equipment in the drilling of wells, but its charges therefor shall not exceed the prevailing
rates in the area and the rate of such charges shall be agreed upon by the parties in writing before drilling operations are commenced, and
such work shall be performed by Operator under the same terms and conditions as are customary and usual in the area in contracts of in-
dependent contractors who are doing work of a similar nature.

ARTICLE VI.

DRILLING AND DEVELOPMENT

A.  Initial Well:

On or before the ____31st____day of____August_____ , 19__99__ , Operator shall commence the drilling of a well for
oil and gas at the following location: approximately one hundred fifty feet from the South line and two
hundred feet from the East line of the Charles Graham Survey, Abstract No. 408, Cass
County, Texas

and shall thereafter continue the drilling of the well with due diligence to
a depth of 12,000 feet or a depth sufficient to test the Upper Smackover
formation, whichever is the lesser depth.

unless granite or other practically impenetrable substance or condition in the hole, which renders further drilling impractical, is en-
countered at a lesser depth, or unless all parties agree to complete or abandon the well at a lesser depth.

Operator shall make reasonable tests of all formations encountered during drilling which give indication of containing oil and
gas in quantities sufficient to test, unless this agreement shall be limited in its application to a specific formation or formations, in which
event Operator shall be required to test only the formation or formations to which this agreement may apply.

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

## ARTICLE VI
continued

1     If, in Operator's judgment, the well will not produce oil or gas in paying quantities, and it wishes to plug and abandon the
2 well as a dry hole, the provisions of Article VI.E.1. shall thereafter apply.
3
4
5
6 **B. Subsequent Operations:**
7
8     1. Proposed Operations: Should any party hereto desire to drill any well on the Contract Area other than the well provided
9 for in Article VI.A., or to rework, deepen or plug back a dry hole drilled at the joint expense of all parties or a well jointly owned by all
10 the parties and not then producing in paying quantities, the party desiring to drill, rework, deepen or plug back such a well shall give the
11 other parties written notice of the proposed operation, specifying the work to be performed, the location, proposed depth, objective forma-
12 tion and the estimated cost of the operation. The parties receiving such a notice shall have thirty (30) days after receipt of the notice
13 within which to notify the party wishing to do the work whether they elect to participate in the cost of the proposed operation. If a drill-
14 ing rig is on location, notice of a proposal to rework, plug back or drill deeper may be given by telephone and the response period shall be
15 limited to forty-eight (48) hours, exclusive of Saturday, Sunday and legal holidays. Failure of a party receiving such notice to reply within
16 the period above fixed shall constitute an election by that party not to participate in the cost of the proposed operation. Any notice or
17 response given by telephone shall be promptly confirmed in writing.
18
19
20
21     If all parties elect to participate in such a proposed operation, Operator shall, within ninety (90) days after expiration of the notice
22 period of thirty (30) days (or as promptly as possible after the expiration of the forty-eight (48) hour period when a drilling rig is on loca-
23 tion, as the case may be), actually commence the proposed operation and complete it with due diligence at the risk and expense of all par-
24 ties hereto; provided, however, said commencement date may be extended upon written notice of same by Operator to the other parties,
25 for a period of up to thirty (30) additional days if, in the sole opinion of Operator, such additional time is reasonably necessary to obtain
26 permits from governmental authorities, surface rights (including rights-of-way) or appropriate drilling equipment, or to complete title ex-
27 amination or curative matter required for title approval or acceptance. Notwithstanding the force majeure provisions of Article XI, if the
28 actual operation has not been commenced within the time provided (including any extension thereof as specifically permitted herein) and
29 if any party hereto still desires to conduct said operation, written notice proposing same must be resubmitted to the other parties in accor-
30 dance with the provisions hereof as if no prior proposal had been made.
31
32
33
34     2. Operations by Less than All Parties: If any party receiving such notice as provided in Article VI.B.1. or VII.D.1. (Option
35 No. 2) elects not to participate in the proposed operation, then, in order to be entitled to the benefits of this Article, the party or parties
36 giving the notice and such other parties as shall elect to participate in the operation shall, within ninety (90) days after the expiration of
37 the notice period of thirty (30) days (or as promptly as possible after the expiration of the forty-eight (48) hour period when a drilling rig is
38 on location, as the case may be) actually commence the proposed operation and complete it with due diligence. Operator shall perform all
39 work for the account of the Consenting Parties; provided, however, if no drilling rig or other equipment is on location, and if Operator is
40 a Non-Consenting Party, the Consenting Parties shall either: (a) request Operator to perform the work required by such proposed opera-
41 tion for the account of the Consenting Parties, or (b) designate one (1) of the Consenting Parties as Operator to perform such work. Con-
42 senting Parties, when conducting operations on the Contract Area pursuant to this Article VI.B.2., shall comply with all terms and con-
43 ditions of this agreement.
44
45
46
47     If less than all parties approve any proposed operation, the proposing party, immediately after the expiration of the applicable
48 notice period, shall advise the Consenting Parties of the total interest of the parties approving such operation and its recommendation as
49 to whether the Consenting Parties should proceed with the operation as proposed. Each Consenting Party, within forty-eight (48) hours
50 (exclusive of Saturday, Sunday and legal holidays) after receipt of such notice, shall advise the proposing party of its desire to (a) limit par-
51 ticipation to such party's interest as shown on Exhibit "A" or (b) carry its proportionate part of Non-Consenting Parties' interests, and
52 failure to advise the proposing party shall be deemed an election under (a). In the event a drilling rig is on location, the time permitted for
53 such a response shall not exceed a total of forty-eight (48) hours (inclusive of Saturday, Sunday and legal holidays). The proposing party,
54 at its election, may withdraw such proposal if there is insufficient participation and shall promptly notify all parties of such decision.
55
56
57
58     The entire cost and risk of conducting such operations shall be borne by the Consenting Parties in the proportions they have
59 elected to bear same under the terms of the preceding paragraph. Consenting Parties shall keep the leasehold estates involved in such
60 operations free and clear of all liens and encumbrances of every kind created by or arising from the operations of the Consenting Parties.
61 If such an operation results in a dry hole, the Consenting Parties shall plug and abandon the well and restore the surface location at their
62 sole cost, risk and expense. If any well drilled, reworked, deepened or plugged back under the provisions of this Article results in a pro-
63 ducer of oil and/or gas in paying quantities, the Consenting Parties shall complete and equip the well to produce at their sole cost and risk,
64
65   *   recomplete, sidetrack,
66
67
68
69
70

Case 2:00-cv-00074   Document 1   Filed in TXSD on 02/22/2000   Page 27 of 62

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

## ARTICLE VI
### continued

1   and the well shall then be turned over to Operator and shall be operated by it at the expense and for the account of the Consenting Par-
2   ties. Upon commencement of operations for the drilling, reworking, deepening or plugging back of any such well by Consenting Parties
3   in accordance with the provisions of this Article, each Non-Consenting Party shall be deemed to have relinquished to Consenting Parties,
4   and the Consenting Parties shall own and be entitled to receive, in proportion to their respective interests, all of such Non-Consenting
5   Party's interest in the well and share of production therefrom until the proceeds of the sale of such share, calculated at the well, or
6   market value thereof if such share is not sold, (after deducting production taxes, excise taxes, royalty, overriding royalty and other in-
7   terests not excepted by Article III.D. payable out of or measured by the production from such well accruing with respect to such interest
8   until it reverts) shall equal the total of the following:

9
10
11      500
12      (a) 100% of each such Non-Consenting Party's share of the cost of any newly acquired surface equipment beyond the wellhead
13   connections (including, but not limited to, stock tanks, separators, treaters, pumping equipment and piping), plus 100% of each such
14   Non-Consenting Party's share of the cost of operation of the well commencing with first production and continuing until each Non-
15   Consenting Party's relinquished interest shall revert to it under other provisions of this Article, it being agreed that each Non-
16   Consenting Party's share of such costs and equipment will be that interest which would have been chargeable to such Non-Consenting
17   Party had it participated in the well from the beginning of the operations; and
18
19
20
21      (b) _500_ % of that portion of the costs and expenses of drilling, reworking, deepening, plugging back, testing and completing,
22   after deducting any cash contributions received under Article VIII.C., and _500_ % of that portion of the cost of newly acquired equip-
23   ment in the well (to and including the wellhead connections), which would have been chargeable to such Non-Consenting Party if it had
24   participated therein.
25
26
27
28      An election not to participate in the drilling or the deepening of a well shall be deemed an election not to participate in any re-
29   working or plugging back operation proposed in such a well, or portion thereof, to which the initial Non-Consent election applied that is
30   conducted at any time prior to full recovery by the Consenting Parties of the Non-Consenting Party's recoupment account. Any such
31   reworking or plugging back operation conducted during the recoupment period shall be deemed part of the cost of operation of said well
32   and there shall be added to the sums to be recouped by the Consenting Parties one hundred percent (100%) of that portion of the costs of
33   the reworking or plugging back operation which would have been chargeable to such Non-Consenting Party had it participated therein. If
34   such a reworking or plugging back operation is proposed during such recoupment period, the provisions of this Article VI.B. shall be ap-
35   plicable as between said Consenting Parties in said well.
36
37
38
39      During the period of time Consenting Parties are entitled to receive Non-Consenting Party's share of production, or the
40   proceeds therefrom, Consenting Parties shall be responsible for the payment of all production, severance, excise, gathering and other
41   taxes, and all royalty, overriding royalty and other burdens applicable to Non-Consenting Party's share of production not excepted by Ar-
42   ticle III.D.
43
44
45
46      In the case of any reworking, plugging back or deeper drilling operation, the Consenting Parties shall be permitted to use, free
47   of cost, all casing, tubing and other equipment in the well, but the ownership of all such equipment shall remain unchanged; and upon
48   abandonment of a well after such reworking, plugging back or deeper drilling, the Consenting Parties shall account for all such equip-
49   ment to the owners thereof, with each party receiving its proportionate part in kind or in value, less cost of salvage.
50
51
52
53      Within sixty (60) days after the completion of any operation under this Article, the party conducting the operations for the
54   Consenting Parties shall furnish each Non-Consenting Party with an inventory of the equipment in and connected to the well, and an
55   itemized statement of the cost of drilling, deepening, plugging back, testing, completing, and equipping the well for production; or, at its
56   option, the operating party, in lieu of an itemized statement of such costs of operation, may submit a detailed statement of monthly bill-
57   ings. Each quarter thereafter, during the time the Consenting Parties are being reimbursed as provided above, the party conducting the
58   operations for the Consenting Parties shall furnish the Non-Consenting Parties with an itemized statement of all costs and liabilities in-
59   curred in the operation of the well, together with a statement of the quantity of oil and gas produced from it and the amount of proceeds
60   realized from the sale of the well's working interest production during the preceding month. In determining the quantity of oil and gas
61   produced during any month, Consenting Parties shall use industry accepted methods such as, but not limited to, metering or periodic
62   well tests. Any amount realized from the sale or other disposition of equipment newly acquired in connection with any such operation
63   which would have been owned by a Non-Consenting Party had it participated therein shall be credited against the total unreturned costs
64   of the work done and of the equipment purchased in determining when the interest of such Non-Consenting Party shall revert to it as
65   above provided; and if there is a credit balance, it shall be paid to such Non-Consenting Party.
66
67   * recompleting, sidetracking
68
69
70

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

ARTICLE VI
continued

1    If and when the Consenting Parties recover from a Non-Consenting Party's relinquished interest the amounts provided for above,
2 the relinquished interests of such Non-Consenting Party shall automatically revert to it, and, from and after such reversion, such Non-
3 Consenting Party shall own the same interest in such well, the material and equipment in or pertaining thereto, and the production
4 therefrom as such Non-Consenting Party would have been entitled to had it participated in the drilling, reworking, deepening or plugging
5 back of said well. Thereafter, such Non-Consenting Party shall be charged with and shall pay its proportionate part of the further costs of
6 the operation of said well in accordance with the terms of this agreement and the Accounting Procedure attached hereto.
7
8
9
10    Notwithstanding the provisions of this Article VI.B.2., it is agreed that without the mutual consent of all parties, no wells shall
11 be completed in or produced from a source of supply from which a well located elsewhere on the Contract Area is producing, unless such
12 well conforms to the then-existing well spacing pattern for such source of supply.
13
14
15
16    The provisions of this Article shall have no application whatsoever to the drilling of the initial well described in Article VI.A.
17 except (a) as to Article VI.D.1. (Option No. 2), if selected, or (b) as to the reworking, deepening and plugging back of such initial well
18 after it has been drilled to the depth specified in Article VI.A. if it shall thereafter prove to be a dry hole or, if initially completed for pro-
19 duction, ceases to produce in paying quantities.
20
21
22
23    3. Stand-By Time: When a well which has been drilled or deepened has reached its authorized depth and all tests have been
24 completed, and the results thereof furnished to the parties, stand-by costs incurred pending response to a party's notice proposing a
25 reworking, deepening, plugging back or completing operation in such a well shall be charged and borne as part of the drilling or deepen-
26 ing operation just completed. Stand-by costs subsequent to all parties responding, or expiration of the response time permitted, whichever
27 first occurs, and prior to agreement as to the participating interests of all Consenting Parties pursuant to the terms of the second gram-
28 matical paragraph of Article VI.B.2, shall be charged to and borne as part of the proposed operation, but if the proposal is subsequently
29 withdrawn because of insufficient participation, such stand-by costs shall be allocated between the Consenting Parties in the proportion
30 each Consenting Party's interest as shown on Exhibit "A" bears to the total interest as shown on Exhibit "A" of all Consenting Par-
31 ties.
32
33
34
35    4. Sidetracking: Except as hereinafter provided, those provisions of this agreement applicable to a "deepening" operation shall
36 also be applicable to any proposal to directionally control and intentionally deviate a well from vertical so as to change the bottom hole
37 location (herein called "sidetracking"), unless done to straighten the hole or to drill around junk in the hole or because of other
38 mechanical difficulties. Any party having the right to participate in a proposed sidetracking operation that does not own an interest in the
39 affected well bore at the time of the notice shall, upon electing to participate, tender to the well bore owners its proportionate share (equal
40 to its interest in the sidetracking operation) of the value of that portion of the existing well bore to be utilized as follows:
41
42
43
44    (a) If the proposal is for sidetracking an existing dry hole, reimbursement shall be on the basis of the actual costs incurred in
45 the initial drilling of the well down to the depth at which the sidetracking operation is initiated.
46
47
48
49    (b) If the proposal is for sidetracking a well which has previously produced, reimbursement shall be on the basis of the well's
50 salvable materials and equipment down to the depth at which the sidetracking operation is initiated, determined in accordance with the
51 provisions of Exhibit "C", less the estimated cost of salvaging and the estimated cost of plugging and abandoning.
52
53
54
55    In the event that notice for a sidetracking operation is given while the drilling rig to be utilized is on location, the response period
56 shall be limited to forty-eight (48) hours, ~~exclusive of Saturday, Sunday and legal holidays;~~ provided, however, any party may request and
57 receive up to eight (8) additional days after expiration of the forty-eight (48) hours within which to respond by paying for all stand-by time
58 incurred during such extended response period. If more than one party elects to take such additional time to respond to the notice, stand-
59 by costs shall be allocated between the parties taking additional time to respond on a day-to-day basis in the proportion each electing par-
60 ty's interest as shown on Exhibit "A" bears to the total interest as shown on Exhibit "A" of all the electing parties. In all other in-
61 stances the response period to a proposal for sidetracking shall be limited to thirty (30) days.
62
63
64
65 C.  TAKING PRODUCTION IN KIND:
66    have the right to
67    Each party shall take in kind or separately dispose of its proportionate share of all oil and gas produced from the Contract Area,
68 exclusive of production which may be used in development and producing operations and in preparing and treating oil and gas for
69 marketing purposes and production unavoidably lost. Any extra expenditure incurred in the taking in kind or separate disposition by any
70 party of its proportionate share of the production shall be borne by such party. Any party taking its share of production in kind shall be

    *  recompleting, sidetracking,

Use of this form identifies user as a participant
except when authorized in writing by the
American Association of Petroleum Landmen

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

## ARTICLE VI
### continued

1    required to pay for only its proportionate share of such part of Operator's surface facilities which it uses.

2

3        Each party shall execute such division orders and contracts as may be necessary for the sale of its interest in production from
4    the Contract Area, and, except as provided in Article VII.B., shall be entitled to receive payment directly from the purchaser thereof for
5    its share of all production.

6

7        In the event any party shall fail to make the arrangements necessary to take in kind or separately dispose of its proportionate share of
8    the oil produced from the Contract Area, Operator shall have the right, subject to the revocation at will by the party owning it, but not
9    the obligation, to purchase such oil or sell it to others at any time and from time to time, for the account of the non-taking party at the
10   best price obtainable in the area for such production. Any such purchase or sale by Operator shall be subject always to the right of the
11   owner of the production to exercise at any time its right to take in kind, or separately dispose of, its share of all oil not previously
12   delivered to a purchaser. Any purchase or sale by Operator of any other party's share of oil shall be only for such reasonable periods of
13   time as are consistent with the minimum needs of the industry under the particular circumstances, but in no event for a period in excess
14   of one (1) year.

15

16       In the event one or more parties' separate disposition of its share of the gas causes split-stream deliveries to separate pipelines and/or
17   deliveries which on a day-to-day basis for any reason are not exactly equal to a party's respective proportionate share of total gas sales to
18   be allocated to it, the balancing or accounting between the respective accounts of the parties shall be in accordance with any gas balancing
19   agreement between the parties hereto, whether such an agreement is attached as Exhibit "E", or is a separate agreement.

20

21   D.  Access to Contract Area and Information:

22

23       Each/party shall have access to the Contract Area at all reasonable times, at its sole cost and risk to inspect or observe operations,
24   and shall have access at reasonable times to information pertaining to the development or operation thereof, including Operator's books
25   and records relating thereto. Operator, upon request, shall furnish each/of the other parties with copies of all forms or reports filed with
26   governmental agencies, daily drilling reports, well logs, tank tables, daily gauge and run tickets and reports of stock on hand at the first of
27   each month, and shall make available samples of any cores or cuttings taken from any well drilled on the Contract Area. The cost of
28   gathering and furnishing information to Non-Operator, other than that specified above, shall be charged to the Non-Operator that re-
29   quests the information.

30

31   E.  Abandonment of Wells:

32

33       1. Abandonment of Dry Holes: Except for any well drilled or deepened pursuant to Article VI.B.2., any well which has been
34   drilled or deepened under the terms of this agreement and is proposed to be completed as a dry hole shall not be plugged and abandoned
35   without the consent of all parties. Should Operator, after diligent effort, be unable to contact any party, or should any party fail to reply
36   within forty-eight (48) hours (exclusive of Saturday, Sunday and legal holidays) after receipt of notice of the proposal to plug and abandon
37   such well, such party shall be deemed to have consented to the proposed abandonment. All such wells shall be plugged-and abandoned in
38   accordance with applicable regulations and at the cost, risk and expense of the parties who participated in the cost of drilling or deepening
39   such well. Any party who objects to plugging and abandoning such well shall have the right to take over the well and conduct further
40   operations in search of oil and/or gas subject to the provisions of Article VI.B.

41

42       2. Abandonment of Wells that have Produced: Except for any well in which a Non-Consent operation has been conducted
43   hereunder for which the Consenting Parties have not been fully reimbursed as herein provided, any well which has been completed as a
44   producer shall not be plugged and abandoned without the consent of all parties. If all parties consent to such abandonment, the well shall
45   be plugged and abandoned in accordance with applicable regulations and at the cost, risk and expense of all the parties hereto. If, within
46   thirty (30) days after receipt of notice of the proposed abandonment of any well, all parties do not agree to the abandonment of such well,
47   those wishing to continue its operation from the interval(s) of the formation(s) then open to production shall tender to each of the other
48   parties its proportionate share of the value of the well's salvable material and equipment, determined in accordance with the provisions of
49   Exhibit "C", less the estimated cost of salvaging and the estimated cost of plugging and abandoning. Each abandoning party shall assign
50   the non-abandoning parties, without warranty, express or implied, as to title or as to quantity, or fitness for use of the equipment and
51   material, all of its interest in the well and related equipment, together with its interest in the leasehold estate as to, but only as to, the in-
52   terval or intervals of the formation or formations then open to production. If the interest of the abandoning party is or includes an oil and
53   gas interest, such party shall execute and deliver to the non-abandoning party or parties an oil and gas lease, limited to the interval or in-
54   tervals of the formation or formations then open to production, for a term of one (1) year and so long thereafter as oil and/or gas is pro-
55   duced from the interval or intervals of the formation or formations covered thereby, such lease to be on the form attached as Exhibit

56

57

58

59

60

61

62

63

64

65

66

67

68

69

70



Use of this identifying mark is prohibited except when authorized in writing by the American Association of Petroleum Landmen.

# A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982
## ARTICLE VI
### continued

"B". The assignments or leases so limited shall encompass the "drilling unit" upon which the well is located. The payments by, and the assignments or leases to, the assignees shall be in a ratio based upon the relationship of their respective percentage of participation in the Contract Area to the aggregate of the percentages of participation in the Contract Area of all assignees. There shall be no readjustment of interests in the remaining portion of the Contract Area.

Thereafter, abandoning parties shall have no further responsibility, liability, or interest in the operation of or production from the well in the interval or intervals then open other than the royalties retained in any lease made under the terms of this Article. Upon request, Operator shall continue to operate the assigned well for the account of the non-abandoning parties at the rates and charges contemplated by this agreement, plus any additional cost and charges which may arise as the result of the separate ownership of the assigned well. Upon proposed abandonment of the producing interval(s) assigned or leased, the assignor or lessor shall then have the option to repurchase its prior interest in the well (using the same valuation formula) and participate in further operations therein subject to the provisions hereof.

3. Abandonment of Non-Consent Operations: The provisions of Article VI.E.1. or VI.E.2. above shall be applicable as between Consenting Parties in the event of the proposed abandonment of any well excepted from said Articles; provided, however, no well shall be permanently plugged and abandoned unless and until all parties having the right to conduct further operations therein have been notified of the proposed abandonment and afforded the opportunity to elect to take over the well in accordance with the provisions of this Article VI.E.

## ARTICLE VII.
## EXPENDITURES AND LIABILITY OF PARTIES

### A. Liability of Parties:

The liability of the parties shall be several, not joint or collective. Each party shall be responsible only for its obligations, and shall be liable only for its proportionate share of the costs of developing and operating the Contract Area. Accordingly, the liens granted among the parties in Article VII.B. are given to secure only the debts of each severally. It is not the intention of the parties to create, nor shall this agreement be construed as creating, a mining or other partnership or association, or to render the parties liable as partners.

### B. Liens and Payment Defaults:

Each Non-Operator grants to Operator a lien upon its oil and gas rights in the Contract Area, and a security interest in its share of oil and/or gas when extracted and its interest in all equipment, to secure payment of its share of expense, together with interest thereon at the rate provided in Exhibit "C". To the extent that Operator has a security interest under the Uniform Commercial Code of the state, Operator shall be entitled to exercise the rights and remedies of a secured party under the Code. The bringing of a suit and the obtaining of judgment by Operator for the secured indebtedness shall not be deemed an election of remedies or otherwise affect the lien rights or security interest as security for the payment thereof. In addition, upon default by any Non-Operator in the payment of its share of expense, Operator shall have the right, without prejudice to other rights or remedies, to collect from the purchaser the proceeds from the sale of such Non-Operator's share of oil and/or gas until the amount owed by such Non-Operator, plus interest, has been paid. Each purchaser shall be entitled to rely upon Operator's written statement concerning the amount of any default. Operator grants a like lien and security interest to the Non-Operators to secure payment of Operator's proportionate share of expense.

If any party fails or is unable to pay its share of expense within sixty (60) days after rendition of a statement therefor by Operator, the non-defaulting parties, including Operator, shall, upon request by Operator, pay the unpaid amount in the proportion that the interest of each such party bears to the interest of all such parties. Each party so paying its share of the unpaid amount shall, to obtain reimbursement thereof, be subrogated to the security rights described in the foregoing paragraph.

### C. Payments and Accounting:

Except as herein otherwise specifically provided, Operator shall promptly pay and discharge expenses incurred in the development and operation of the Contract Area pursuant to this agreement and shall charge each of the parties hereto with their respective proportionate shares upon the expense basis provided in Exhibit "C". Operator shall keep an accurate record of the joint account hereunder, showing expenses incurred and charges and credits made and received.

Operator, at its election, shall have the right from time to time to demand and receive from the other parties payment in advance of their respective shares of the estimated amount of the expense to be incurred in operations hereunder during the next succeeding month, which right may be exercised only by submission to each such party of an itemized statement of such estimated expense, together with an invoice for its share thereof. Each such statement and invoice for the payment in advance of estimated expense shall be submitted on or before the 20th day of the next preceding month. Each party shall pay to Operator its proportionate share of such estimate within fifteen (15) days after such estimate and invoice is received. If any party fails to pay its share of said estimate within said time, the amount due shall bear interest as provided in Exhibit "C" until paid. Proper adjustment shall be made monthly between advances and actual expense to the end that each party shall bear and pay its proportionate share of actual expenses incurred, and no more.

### D. Limitation of Expenditures:

1. Drill or Deepen: Without the consent of all parties, no well shall be drilled or deepened, except any well drilled or deepened pursuant to the provisions of Article VI.B.2. of this agreement. Consent to the drilling or deepening shall include

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

## ARTICLE VII
### continued

1  ☐ ~~Option No. 1: All necessary expenditures for the drilling or deepening, testing, completing and equipping of the well, including~~
2  ~~necessary tankage and/or surface facilities.~~

3
4  ☒ Option No. 2: All necessary expenditures for the drilling or deepening and testing of the well. When such well has reached its
5  authorized depth, and all tests have been completed, and the results thereof furnished to the parties, Operator shall give immediate notice
6  to the Non-Operators who have the right to participate in the completion costs. The parties receiving such notice shall have forty-eight
7  (48) hours ~~(exclusive of Saturday, Sunday and legal holidays)~~ in which to elect to participate in the setting of casing and the completion at-
8  tempt. Such election, when made, shall include consent to all necessary expenditures for the completing and equipping of such well, in-
9  cluding necessary tankage and/or surface facilities. Failure of any party receiving such notice to reply within the period above fixed shall
10 constitute an election by that party not to participate in the cost of the completion attempt. If one or more, but less than all of the parties,
11 elect to set pipe and to attempt a completion, the provisions of Article VI.B.2. hereof (the phrase "reworking," deepening or plugging
12 back" as contained in Article VI.B.2. shall be deemed to include "completing") shall apply to the operations thereafter conducted by less
13 then all parties.

14
15  . 2. Rework or Plug Back: Without the consent of all parties, no well shall be reworked or plugged back except a well reworked or
16 plugged back pursuant to the provisions of Article VI.B.2. of this agreement. Consent to the reworking or plugging back of a well shall
17 include all necessary expenditures in conducting such operations and completing and equipping of said well, including necessary tankage
18 and/or surface facilities.

19                                     the majority interest
20  3. Other Operations: Without the consent of ~~all parties,~~ Operator shall not undertake any single project reasonably estimated
21 to require an expenditure in excess of Fifty Thousand and No/100----------Dollars ($ 50,000.00          )
22 except in connection with a well, the drilling, reworking, deepening, completing, recompleting, or plugging back of which has been
23 previously authorized by or pursuant to this agreement; provided, however, that, in case of explosion, fire, flood or other sudden
24 emergency, whether of the same or different nature, Operator may take such steps and incur such expenses as in its opinion are required
25 to deal with the emergency to safeguard life and property but Operator, as promptly as possible, shall report the emergency to the other
26 parties. If Operator prepares an authority for expenditure (AFE) for its own use, Operator shall furnish any Non-Operator so requesting
27 an information copy thereof for any single project costing in excess of Fifty Thousand and No/100------------
28 Dollars ($ 50,000.00          ) but less then the amount first set forth above in this paragraph.

29
30  E.  Rentals, Shut-in Well Payments and Minimum Royalties:
31                                   Operator and charged to the joint account.
32      Rentals, shut-in well payments and minimum royalties which may be required under the terms of any lease shall be paid by the /
33 ~~party or parties who subjected such lease to this agreement at its or their expense. In the event two or more parties own and have con-~~
34 ~~tributed interests in the same lease to this agreement, such parties may designate one of such parties to make said payments for and on~~
35 ~~behalf of all such parties.~~ Any party may request, and shall be entitled to receive, proper evidence of all such payments. In the event of
36 failure to make proper payment of any rental, shut-in well payment or minimum royalty through mistake or oversight where such pay-
37 ment is required to continue the lease in force, any loss which results from such non-payment shall be borne in accordance with the pro-
38 visions of Article IV.B.3.

39
40      Operator shall notify Non-Operator of the anticipated completion of a shut-in gas well, or the shutting in or return to production
41 of a producing gas well, ~~at least five (5) days (excluding Saturday, Sunday and legal holidays),~~ as at the earliest opportunity permitted by
42 circumstances, prior to taking such action, but assumes no liability for failure to do so. In the event of failure by Operator to so notify
43 Non-Operator, the loss of any lease contributed hereto by Non-Operator for failure to make timely payments of any shut-in well payment
44 shall be borne jointly by the parties hereto under the provisions of Article IV.B.3.

45
46  F.  Taxes:

47
48      Beginning with the first calendar year after the effective date hereof, Operator shall render for ad valorem taxation all property
49 subject to this agreement which by law should be rendered for such taxes, and it shall pay all such taxes assessed thereon before they
50 become delinquent. Prior to the rendition date, each Non-Operator shall furnish Operator information as to burdens (to include, but not
51 be limited to, royalties, overriding royalties and production payments) on leases and oil and gas interests contributed by such Non-
52 Operator. If the assessed valuation of any leasehold estate is reduced by reason of its being subject to outstanding excess royalties, over-
53 riding royalties or production payments, the reduction in ad valorem taxes resulting therefrom shall inure to the benefit of the owner or
54 owners of such leasehold estate, and Operator shall adjust the charge to such owner or owners so as to reflect the benefit of such reduc-
55 tion. If the ad valorem taxes are based in whole or in part upon separate valuations of each party's working interest, then notwithstanding
56 anything to the contrary herein, charges to the joint account shall be made and paid by the parties hereto in accordance with the tax
57 value generated by each party's working interest. Operator shall bill the other parties for their proportionate shares of all tax payments in
58 the manner provided in Exhibit "C".

59                    :9:
60      If Operator considers any tax assessment improper, Operator may, at its discretion, protest within the time and manner
61 prescribed by law, and prosecute the protest to a final determination, unless all parties agree to abandon the protest prior to final deter-
62 mination. During the pendency of administrative or judicial proceedings, Operator may elect to pay, under protest, all such taxes and any
63 interest and penalty. When any such protested assessment shall have been finally determined, Operator shall pay the tax for the joint ac-
64 count, together with any interest and penalty accrued, and the total cost shall then be assessed against the parties, and be paid by them, as
65 provided in Exhibit "C".

66
67      Each party shall pay or cause to be paid all production, severance, excise, gathering and other taxes imposed upon with respect to
68 the production or handling of such party's share of oil and/or gas produced under the terms of this agreement.

69
70    *recompleting, sidetracking

*Extra Page*

# A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

## ARTICLE VII
### continued

1   ☐ ~~Option No. 1: All necessary expenditures for the drilling or deepening, testing, completing and equipping of the well, including~~
2   ~~necessary tankage and/or surface facilities.~~

3

4   ☒ Option No. 2: All necessary expenditures for the drilling or deepening and testing of the well. When such well has reached its
5   authorized depth, and all tests have been completed, and the results thereof furnished to the parties, Operator shall give immediate notice
6   to the Non-Operators who have the right to participate in the completion costs. The parties receiving such notice shall have forty-eight
7   (48) hours ~~(exclusive of Saturday, Sunday and legal holidays)~~ in which to elect to participate in the setting of casing and the completion at-
8   tempt. Such election, when made, shall include consent to all necessary expenditures for the completing and equipping of such well, in-
9   cluding necessary tankage and/or surface facilities. Failure of any party receiving such notice to reply within the period above fixed shall
10  constitute an election by that party not to participate in the cost of the completion attempt. If one or more, but less than all of the parties,
11  elect to set pipe and to attempt a completion, the provisions of Article VI.B.2. hereof (the phrase "reworking, deepening or plugging
12  back" as contained in Article VI.B.2. shall be deemed to include "completing") shall apply to the operations thereafter conducted by less
13  than all parties.

14

15  . 2. Rework or Plug Back: Without the consent of all parties, no well shall be reworked or plugged back except a well reworked or
16  plugged back pursuant to the provisions of Article VI.B.2. of this agreement. Consent to the reworking or plugging back of a well shall
17  include all necessary expenditures in conducting such operations and completing and equipping of said well, including necessary tankage
18  and/or surface facilities.

19                              the majority interest

20  3. Other Operations: Without the consent of ~~all parties,~~ Operator shall not undertake any single project reasonably estimated
21  to require an expenditure in excess of <u>Fifty Thousand and No/100------------</u>Dollars ($ <u>50,000.00</u>     )
22  except in connection with a well, the drilling, reworking, deepening, completing, recompleting, or plugging back of which has been
23  previously authorized by or pursuant to this agreement; provided, however, that, in case of explosion, fire, flood or other sudden
24  emergency, whether of the same or different nature, Operator may take such steps and incur such expenses as in its opinion are required
25  to deal with the emergency to safeguard life and property but Operator, as promptly as possible, shall report the emergency to the other
26  parties. If Operator prepares an authority for expenditure (AFE) for its own use, Operator shall furnish any Non-Operator so requesting
27  an information copy thereof for any single project costing in excess of <u>Fifty Thousand and No/100-------------</u>
28  Dollars ($ <u>50,000.00</u>     ) but less then the amount first set forth above in this paragraph.

29

30  E. Rentals, Shut-in Well Payments and Minimum Royalties:
31                              Operator and charged to the joint account.
32      Rentals, shut-in well payments and minimum royalties which may be required under the terms of any lease shall be paid by the /
33  ~~party or parties who subjected such lease to this agreement at its or their expense. In the event two or more parties own and have con-~~
34  ~~tributed interests in the same lease to this agreement, such parties may designate one of such parties to make said payments for and on~~
35  ~~behalf of all such parties.~~ Any party may request, and shall be entitled to receive, proper evidence of all such payments. In the event of
36  failure to make proper payment of any rental, shut-in well payment or minimum royalty through mistake or oversight where such pay-
37  ment is required to continue the lease in force, any loss which results from such non-payment shall be borne in accordance with the pro-
38  visions of Article IV.B.3.

39

40      Operator shall notify Non-Operator of the anticipated completion of a shut-in gas well, or the shutting in or return to production
41  of a producing gas well, ~~at least five (5) days (excluding Saturday, Sunday and legal holidays),~~ as at the earliest opportunity permitted by
42  circumstances, prior to taking such action, but assumes no liability for failure to do so. In the event of failure by Operator to so notify
43  Non-Operator, the loss of any lease contributed hereto by Non-Operator for failure to make timely payments of any shut-in well payment
44  shall be borne jointly by the parties hereto under the provisions of Article IV.B.3.

45

46  F. Taxes:

47

48      Beginning with the first calendar year after the effective date hereof, Operator shall render for ad valorem taxation all property
49  subject to this agreement which by law should be rendered for such taxes, and it shall pay all such taxes assessed thereon before they
50  become delinquent. Prior to the rendition date, each Non-Operator shall furnish Operator information as to burdens (to include, but not
51  be limited to, royalties, overriding royalties and production payments) on leases and oil and gas interests contributed by such Non-
52  Operator. If the assessed valuation of any leasehold estate is reduced by reason of its being subject to outstanding excess royalties, over-
53  riding royalties or production payments, the reduction in ad valorem taxes resulting therefrom shall inure to the benefit of the owner or
54  owners of such leasehold estate, and Operator shall adjust the charge to such owner or owners so as to reflect the benefit of such reduc-
55  tion. If the ad valorem taxes are based in whole or in part upon separate valuations of each party's working interest, then notwithstanding
56  anything to the contrary herein, charges to the joint account shall be made and paid by the parties hereto in accordance with the tax
57  value generated by each party's working interest. Operator shall bill the other parties for their proportionate shares of all tax payments in
58  the manner provided in Exhibit "C".
59                      :5-

60      If Operator considers any tax assessment improper, Operator may, at its discretion, protest within the time and manner
61  prescribed by law, and prosecute the protest to a final determination, unless all parties agree to abandon the protest prior to final deter-
62  mination. During the pendency of administrative or judicial proceedings, Operator may elect to pay, under protest, all such taxes and any
63  interest and penalty. When any such protested assessment shall have been finally determined, Operator shall pay the tax for the joint ac-
64  count, together with any interest and penalty accrued, and the total cost shall then be assessed against the parties, and be paid by them, as
65  provided in Exhibit "C".

66

67      Each party shall pay or cause to be paid all production, severance, excise, gathering and other taxes imposed upon or with respect to
68  the production or handling of such party's share of oil and/or gas produced under the terms of this agreement.

69

70      *recompleting, sidetracking*     *Extra Page*

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

### ARTICLE VII
continued

1
2   G.  Insurance:
3
4       At all times while operations are conducted hereunder, Operator shall comply with the workmen's compensation law of
5   the state where the operations are being conducted; provided, however, that Operator may be a self-insurer for liability under said com-
6   pensation laws in which event the only charge that shall be made to the joint account shall be as provided in Exhibit "C". Operator shall
7   also carry or provide insurance for the benefit of the joint account of the parties as outlined in Exhibit "D", attached to and made a part
8   hereof. Operator shall require all contractors engaged in work on or for the Contract Area to comply with the workmen's compensation
9   law of the state where the operations are being conducted and to maintain such other insurance as Operator may require.
10
11      In the event automobile public liability insurance is specified in said Exhibit "D", or subsequently receives the approval of the
12  parties, no direct charge shall be made by Operator for premiums paid for such insurance for Operator's automotive equipment.
13
14                                  ARTICLE VIII.
15                  ACQUISITION, MAINTENANCE OR TRANSFER OF INTEREST
16
17  A.  Surrender of Leases:
18
19      The leases covered by this agreement, insofar as they embrace acreage in the Contract Area, shall not be surrendered in whole
20  or in part unless all parties consent thereto.
21
22      However, should any party desire to surrender its interest in any lease or in any portion thereof, and the other parties do not
23  agree or consent thereto, the party desiring to surrender shall assign, without express or implied warranty of title, all of its interest in
24  such lease, or portion thereof, and any well, material and equipment which may be located thereon and any rights in production
25  thereafter secured, to the parties not consenting to such surrender. If the interest of the assigning party is or includes an oil and gas in-
26  terest, the assigning party shall execute and deliver to the party or parties not consenting to such surrender an oil and gas lease covering
27  such oil and gas interest for a term of one (1) year and so long thereafter as oil and/or gas is produced from the land covered thereby, such
28  lease to be on the form attached hereto as Exhibit "B". Upon such assignment or lease, the assigning party shall be relieved from all
29  obligations thereafter accruing, but not theretofore accrued, with respect to the interest assigned or leased and the operation of any well
30  attributable thereto, and the assigning party shall have no further interest in the assigned or leased premises and its equipment and pro-
31  duction other than the royalties retained in any lease made under the terms of this Article. The party assignee or lessee shall pay to the
32  party assignor or lessor the reasonable salvage value of the latter's interest in any wells and equipment attributable to the assigned or leas-
33  ed acreage. The value of all material shall be determined in accordance with the provisions of Exhibit "C", less the estimated cost of
34  salvaging and the estimated cost of plugging and abandoning. If the assignment or lease is in favor of more than one party, the interest
35  shall be shared by such parties in the proportions that the interest of each bears to the total interest of all such parties.
36
37      Any assignment, lease or surrender made under this provision shall not reduce or change the assignor's, lessor's or surrendering
38  party's interest as it was immediately before the assignment, lease or surrender in the balance of the Contract Area; and the acreage
39  assigned, leased or surrendered, and subsequent operations thereon, shall not thereafter be subject to the terms and provisions of this
40  agreement.
41
42  B.  Renewal or Extension of Leases:
43
44      If any party secures a renewal of any oil and gas lease subject to this agreement, all other parties shall be notified promptly, and
45  shall have the right for a period of thirty (30) days following receipt of such notice in which to elect to participate in the ownership of the
46  renewal lease, insofar as such lease affects lands within the Contract Area, by paying to the party who acquired it their several proper pro-
47  portionate shares of the acquisition cost allocated to that part of such lease within the Contract Area, which shall be in proportion to the
48  interests held at that time by the parties in the Contract Area.
49
50      If some, but less than all, of the parties elect to participate in the purchase of a renewal lease, it shall be owned by the parties
51  who elect to participate therein, in a ratio based upon the relationship of their respective percentage of participation in the Contract Area
52  to the aggregate of the percentages of participation in the Contract Area of all parties participating in the purchase of such renewal lease.
53  Any renewal lease in which less than all parties elect to participate shall not be subject to this agreement.
54
55      Each party who participates in the purchase of a renewal lease shall be given an assignment of its proportionate interest therein
56  by the acquiring party.
57
58      The provisions of this Article shall apply to renewal leases whether they are for the entire interest covered by the expiring lease
59  or cover only a portion of its area or an interest therein. Any renewal lease taken before the expiration of its predecessor lease, or taken or
60  contracted for within six (6) months after the expiration of the existing lease shall be subject to this provision; but any lease taken or con-
61  tracted for more than six (6) months after the expiration of an existing lease shall not be deemed a renewal lease and shall not be subject to
62  the provisions of this agreement.
63
64      The provisions of this Article shall also be applicable to extensions of oil and gas leases.
65
66  C.  Acreage or Cash Contributions:
67
68      While this agreement is in force, if any party contracts for a contribution of cash towards the drilling of a well or any other
69  operation on the Contract Area, such contribution shall be paid to the party who conducted the drilling or other operation and shall be
70  applied by it against the cost of such drilling or other operation. If the contribution be in the form of acreage, the party to whom the con-
    tribution is made shall promptly tender an assignment of the acreage, without warranty of title, to the Drilling Parties in the proportions

Use of this [illegible] is prohibited except where written use or revising by the American Association of Petroleum Landmen

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

## ARTICLE VIII
### continued

1   said Drilling Parties shared the cost of drilling the well. Such acreage shall become a separate Contract Area and, to the extent possible, be
2   governed by provisions identical to this agreement. Each party shall promptly notify all other parties of any acreage or cash contributions
3   it may obtain in support of any well or any other operation on the Contract Area. The above provisions shall also be applicable to op-
4   tional rights to earn acreage outside the Contract Area which are in support of a well drilled inside the Contract Area.

5
6      If any party contracts for any consideration relating to disposition of such party's share of substances produced hereunder, such
7   consideration shall not be deemed a contribution as contemplated in this Article VIII.C.

8
9   D.  Maintenance of Uniform Interest:
10
11   ~~For the purpose of maintaining uniformity in ownership in the oil and gas leasehold interests covered by this agreement, no~~
12   ~~party shall sell, encumber, transfer or make other disposition of its interest in the leases embraced within the Contract Area and in wells,~~
13   ~~equipment and production unless such disposition covers either:~~
14
15   ~~1. the entire interest of the party in all leases and equipment and production; or~~
16
17   ~~2. an equal undivided interest in all leases and equipment and production in the Contract Area.~~
18
19      Every ~~such~~ sale, encumbrance, transfer or other disposition made by any party shall be made expressly subject to this agreement
20   and shall be made without prejudice to the right of the other parties.

21
                                                         seven
22      If, at any time the interest of any party is divided among and owned by ~~four~~ or more co-owners, Operator, at its discretion, may
23   require such co-owners to appoint a single trustee or agent with full authority to receive notices, approve expenditures, receive billings for
24   and approve and pay such party's share of the joint expenses, and to deal generally with, and with power to bind, the co-owners of such
25   party's interest within the scope of the operations embraced in this agreement; however, all such co-owners shall have the right to enter
26   into and execute all contracts or agreements for the disposition of their respective shares of the oil and gas produced from the Contract
27   Area and they shall have the right to receive, separately, payment of the sale proceeds thereof.

28                                                  *
29   E.  Waiver of Rights to Partition:
30
31      If permitted by the laws of the state or states in which the property covered hereby is located, each party hereto owning an
32   undivided interest in the Contract Area waives any and all rights it may have to partition and have set aside to it in severalty its undivided
33   interest therein.
34
35   F.  Preferential Right to Purchase:
36
37   ~~Should any party desire to sell all or any part of its interests under this agreement, or its rights and interests in the Contract~~
38   ~~Area, it shall promptly give written notice to the other parties, with full information concerning its proposed sale, which shall include the~~
39   ~~name and address of the prospective purchaser (who must be ready, willing and able to purchase), the purchase price, and all other terms~~
40   ~~of the offer. The other parties shall then have an optional prior right, for a period of ten (10) days after receipt of the notice, to purchase~~
41   ~~on the same terms and conditions the interest which the other party proposes to sell; and, if this optional right is exercised, the purchas-~~
42   ~~ing parties shall share the purchased interest in the proportions that the interest of each bears to the total interest of all purchasing par-~~
43   ~~ties. However, there shall be no preferential right to purchase in those cases where any party wishes to mortgage its interests, or to~~
44   ~~dispose of its interests by merger, reorganization, consolidation, or sale of all or substantially all of its assets to a subsidiary or parent com-~~
45   ~~pany or to a subsidiary of a parent company, or to any company in which any one party owns a majority of the stock.~~
46
47                       ARTICLE IX.
48                INTERNAL REVENUE CODE ELECTION
49
50      This agreement is not intended to create, and shall not be construed to create, a relationship of partnership or an association
51   for profit between or among the parties hereto. Notwithstanding any provision herein that the rights and liabilities hereunder are several
52   and not joint or collective, or that this agreement and operations hereunder shall not constitute a partnership, if, for federal income tax
53   purposes, this agreement and the operations hereunder are regarded as a partnership, each party hereby affected elects to be excluded
54   from the application of all of the provisions of Subchapter "K", Chapter 1, Subtitle "A", of the Internal Revenue Code of ~~1954~~, as per-
55   mitted and authorized by Section 761 of the Code and the regulations promulgated thereunder. Operator is authorized and directed to ex-
56   ecute on behalf of each party hereby affected such evidence of this election as may be required by the Secretary of the Treasury of the
57   United States or the Federal Internal Revenue Service, including specifically, but not by way of limitation, all of the returns, statements,
58   and the data required by Federal Regulations 1.761. Should there be any requirement that each party hereby affected give further
59   evidence of this election, each such party shall execute such documents and furnish such other evidence as may be required by the
60   Federal Internal Revenue Service or as may be necessary to evidence this election. No such party shall give any notices or take any other
61   action inconsistent with the election made hereby. If any present or future income tax laws of the state or states in which the Contract
62   Area is located or any future income tax laws of the United States contain provisions similar to those in Subchapter "K", Chapter 1,
63   Subtitle "A", of the Internal Revenue Code of ~~1954~~, under which an election similar to that provided by Section 761 of the Code is per-
64   mitted, each party hereby affected shall make such election as may be permitted or required by such laws. In making the foregoing elec-
65   tion, each such party states that the income derived by such party from operations hereunder can be adequately determined without the
66   computation of partnership taxable income.
67   *  Notwithstanding the foregoing, however, any division or multiplication of interest
68   occurring by reason of the death, or divorce, of any party hereto or by assignment to a
69   relative of a party hereto will not be subject to the limitations of this Article.
70

Use of this Membrane from is prohibited
except when authorized or written for the

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

ARTICLE X.

CLAIMS AND LAWSUITS

Operator may settle any single uninsured third party damage claim or suit arising from operations hereunder if the expenditure does not exceed Twenty Thousand and No/100----------------------------------------Dollars ($ 20,000.00 ) and if the payment is in complete settlement of such claim or suit. If the amount required for settlement exceeds the above amount, the parties hereto shall assume and take over the further handling of the claim or suit, unless such authority is delegated to Operator. All costs and expenses of handling, settling, or otherwise discharging such claim or suit shall be at the joint expense of the parties participating in the operation from which the claim or suit arises. If a claim is made against any party or if any party is sued on account of any matter arising from operations hereunder over which such individual has no control because of the rights given Operator by this agreement, such party shall immediately notify all other parties, and the claim or suit shall be treated as any other claim or suit involving operations hereunder. All claims or suits by outside parties involving title to any interest subject to this agreement shall be treated as a claim or suit against all parties hereto.

ARTICLE XI.

FORCE MAJEURE

If any party is rendered unable, wholly or in part, by force majeure to carry out its obligations under this agreement, other than the obligation to make money payments, that party shall give to all other parties prompt written notice of the force majeure with reasonably full particulars concerning it; thereupon, the obligations of the party giving the notice, so far as they are affected by the force majeure, shall be suspended during, but no longer than, the continuance of the force majeure. The affected party shall use all reasonable diligence to remove the force majeure situation as quickly as practicable.

The requirement that any force majeure shall be remedied with all reasonable dispatch shall not require the settlement of strikes, lockouts, or other labor difficulty by the party involved, contrary to its wishes; how all such difficulties shall be handled shall be entirely within the discretion of the party concerned.

The term "force majeure", as here employed, shall mean an act of God, strike, lockout, or other industrial disturbance, act of the public enemy, war, blockade, public riot, lightning, fire, storm, flood, explosion, governmental action, governmental delay, restraint or inaction, unavailability of equipment, and any other cause, whether of the kind specifically enumerated above or otherwise, which is not reasonably within the control of the party claiming suspension.

ARTICLE XII.

NOTICES

All notices authorized or required between the parties and required by any of the provisions of this agreement, unless otherwise specifically provided, shall be given in writing by mail or telegram, postage or charges prepaid, or by telex or telecopier and addressed to the parties to whom the notice is given at the addresses listed on Exhibit "A". The originating party under any provision hereof shall be deemed given only when received by the party to whom such notice is directed, and the time for such party to give any notice in response thereto shall run from the date the originating notice is received. The second or any responsive notice shall be deemed given when deposited in the mail or with the telegraph company, with postage or charges prepaid, or sent by telex or telecopier. Each party shall have the right to change its address at any time, and from time to time, by giving written notice thereof to all other parties.

ARTICLE XIII.

TERM OF AGREEMENT

This agreement shall remain in full force and effect as to the oil and gas leases and/or oil and gas interests subject hereto for the period of time selected below; provided, however, no party hereto shall ever be construed as having any right, title or interest in or to any lease or oil and gas interest contributed by any other party beyond the term of this agreement.

☒ Option No. 1: So long as any of the oil and gas leases subject to this agreement remain or are continued in force as to any part of the Contract Area, whether by production, extension, renewal or otherwise.

☐ Option No. 2: In the event the well described in Article VI.A., or any subsequent well drilled under any provision of this agreement, results in production of oil and/or gas in paying quantities, this agreement shall continue in force so long as any such well or wells produce, or are capable of production, and for an additional period of _____ days from cessation of all production; provided, however, if, prior to the expiration of such additional period, one or more of the parties hereto are engaged in drilling, reworking, deepening, plugging back, testing or attempting to complete a well or wells hereunder, this agreement shall continue in force until such operations have been completed and if production results therefrom, this agreement shall continue in force as provided herein. In the event the well described in Article VI.A., or any subsequent well drilled hereunder, results in a dry hole, and no other well is producing, or capable of producing oil and/or gas from the Contract Area, this agreement shall terminate unless drilling, deepening, plugging back or reworking operations are commenced within _____ days from the date of abandonment of said well.

It is agreed, however, that the termination of this agreement shall not relieve any party hereto from any liability which has accrued or attached prior to the date of such termination.

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

## ARTICLE XIV.
### COMPLIANCE WITH LAWS AND REGULATIONS

A. Laws, Regulations and Orders:

This agreement shall be subject to the conservation laws of the state in which the Contract Area is located, to the valid rules, regulations, and orders of any duly constituted regulatory body of said state; and to all other applicable federal, state, and local laws, ordinances, rules, regulations, and orders.

B. Governing Law:

This agreement and all matters pertaining hereto, including, but not limited to, matters of performance, non-performance, breach, remedies, procedures, rights, duties and interpretation or construction, shall be governed and determined by the law of the state in which the Contract Area is located. If the Contract Area is in two or more states, the law of the state of ___Texas_____ shall govern.

C. Regulatory Agencies:

Nothing herein contained shall grant, or be construed to grant, Operator the right or authority to waive or release any rights, privileges, or obligations which Non-Operators may have under federal or state laws or under rules, regulations or orders promulgated under such laws in reference to oil, gas and mineral operations, including the location, operation, or production of wells, on tracts offsetting or adjacent to the Contract Area.

With respect to operations hereunder, Non-Operators agree to release Operator from any and all losses, damages, injuries, claims and causes of action arising out of, incident to or resulting directly or indirectly from Operator's interpretation or application of that part of any federal or state laws, rules, regulations or orders of the Department of Energy or predecessor or successor agencies to the extent such interpretation or application was made in good faith. Each Non-Operator further agrees to reimburse Operator for any amounts applicable to such Non-Operator's share of production that Operator may be required to refund, rebate or pay as a result of such an incorrect interpretation or application, together with interest and penalties thereon owing by Operator as a result of such incorrect interpretation or application.

Non-Operators authorize Operator to prepare and submit such documents as may be required to be submitted to the purchaser of any crude oil sold hereunder or to any other person or entity pursuant to the requirements of the "Crude Oil Windfall Profit Tax Act of 1980", as same may be amended from time to time ("Act"), and any valid regulations or rules which may be issued by the Treasury Department from time to time pursuant to said Act. Each party hereto agrees to furnish any and all certifications or other information which is required to be furnished by said Act in a timely manner and in sufficient detail to permit compliance with said Act.

## ARTICLE XV.
### OTHER PROVISIONS

See Attachement for additional provisions A through W.



Use of this identifying mark is published except when authorized in writing by the American Association of Petroleum Landmen

# ARTICLE XV.

## ADDITIONAL PROVISIONS

### A. PRECEDENCE OF OPERATIONS

Where a well that has been authorized under the terms of this Agreement by all parties, has been drilled to the objective depth or the objective formation, whichever is the lesser, and the parties participating in the well cannot agree upon the sequence and timing of further operations regarding such well, the following elections shall control in the order enumerated below:

(1) an election to perform additional logging, coring or testing;

(2) an election to attempt to complete the well at either the objective depth or objective formation;

(3) an election to plug back and attempt to complete the well in a shallower depth or formation;

(4) an election to deepen the well;

(5) an election to sidetrack the well;

(6) an election to rework the well by generally accepted stimulation techniques whether or not the well had previously produced in commercial quantities or is capable of commercial production;

(7) an election to temporarily abandon the well; and

(8) an election to plug and abandon the well;

It is provided, however, that if at any time said participating parties are considering the above election the hole is in such a condition that, in the opinion of a majority of the parties in possessory, cost-bearing interest (and not in number), a reasonably prudent operator would not conduct the operations contemplated by the particular election involved for fear of placing the hole in jeopardy or losing the same prior to completing the well in the objective depth or objective formation, such election shall not be given the priority hereinabove set forth. In such event, the operation, which, in the opinion of a majority of the parties in possessory, cost bearing interest (and not in number) is less likely to jeopardize the well, will be conducted. It is further understood that if some, but not all parties, elect to participate in the additional logging, coring, or testing, they may do so and should the party or parties not participating in such operation elect to participate in completing the well, they shall be required to pay their share of cost of said additional logging, coring and testing and shall be entitled to the logs, cores or the results of the tests.

### B. HOLIDAYS

The word "holidays" when used herein is defined as a legal holiday observed by the United States government and its agencies.

### C. DISPUTES AS TO PROPOSED DEPTHS

If during the drilling of any well drilled hereunder, a bona fide dispute shall exist as to whether the proposed depth has been reached in such well (as for example, whether a well has been drilled to a depth sufficient to test a particular sand or formation or if the well has reached the stratigraphic equivalent of a particular depth), the opinion of a majority of ownership of the total possessory, cost-bearing interest (and not in number) of the owners as shown by Exhibit "A" shall control and be binding upon all parties. If the parties are equally divided, the opinion of the Operator will prevail.

### D. WHEN AN AFE IS EXCEEDED BY 150%

If in drilling any well under the terms of this agreement the operator's estimated cumulative costs of operations prior to reaching the proposed depth exceeds 150% of the Authority for Expenditure (AFE) for such well exclusive of the estimated cost of completion, and for reasons which could not be avoided by abandoning the well (as for example well control costs, fishing costs, etc.), it is agreed that operator shall promptly advise Non-Operator(s). If, after having received such information all parties agree, the Operator may plug and abandon the well or take such other acts as the parties may desire. If the parties cannot agree as to further operations, the following provisions will control:

(1) If a majority in possessory, cost-bearing interest (and not in number) desire to attempt to complete the well at or above the depth reached, further operations shall be conducted as if the well had been drilled to the proposed depth. Those not participating in the completion attempt shall be subject to the terms of provision "A" stated above.

(2) If a majority in possessory, cost-bearing interest (and not in number) elects to continue operation in an attempt to drill the well to the proposed depth, those not desiring to participate in such further operations may become non-consenting parties.

(3)  If a majority in possessory, cost-bearing interest (and not in number) desire to cease further operations and plug and abandon the well without a completion attempt, any one or more of the parties hereto shall have the right to continue drilling in an effort to reach the depth initially proposed in connection with such well. All costs, risk and expense incurred after such takeover by the parties shall be at the sole cost, risk and expense of the parties continuing such further operations. Such parties shall have the right to drill the well to any depth at which they may desire, even beyond the proposed depth. They shall both plug and abandon and restore the surface or complete and equip the well for production in a formation below that reached when such parties took over operations. If the well is completed for production of oil or gas in a formation <u>below</u> that reached after taking over the operation, the consenting parties shall be entitled to all production from the well attributable to the interest of the non-consenting parties without any reversionary rights on the part of the non-consenting parties. If the parties taking over the operation desire to attempt to complete the well in a formation and at a depth <u>above</u> that reached before the well was taken over by them, they shall notify the non-consenting parties who shall have the right either to participate or not to participate.

## E.  ADVANCE OF COSTS

Notwithstanding any other provisions herein, Operator shall have the right to request and receive from each Non-Operator payment in advance of its respective share of (i) the dry hole cost or (at Operator's election) a portion of the completed well cost for the initial well to be drilled under Article VI.A., (ii) the dry hole cost or (at Operator's election) the completed well cost for any other well to be drilled hereunder to which such Non-Operator has consented, and (iii) the cost of any completion, reworking, recompletion, sidetracking, deepening or plugging back operation to which such Non-Operator has consented (any such operation under clause (i), (ii), or (iii) being herein called a "Drilling Operation"). Such request for advance payment may be made upon all Non-Operators or upon any one or more of them to the exclusion of others, and shall be made in writing no earlier than thirty (30) days prior to the anticipated commencement date for such Drilling Operation. The amount of each Non-Operator's advance shall be based upon the latest AFE for such Operation.

A Non-Operator receiving a request for advance payment shall, within two (2) days of the receipt of such request if a drilling rig is on location and within fifteen (15) days of the receipt of such request in all other cases, pay to operator in cash the full amount of such request. Operator shall credit the amount to the Non-Operator's account for the payment of such Non-Operator's share of costs of such Drilling operation, and following the end of each month Operator shall charge such account with such Non-Operator's share of actual costs incurred during such month.

Payment of an advance shall in no event relieve a Non-Operator of its obligation to pay its share of the actual cost of a Drilling Operation, and when the actual costs have been determined, Operator shall adjust the accounts of the parties by refunding any net amounts due or invoicing the parties for additional sums owing, which additional sums shall be paid in accordance with the Accounting Procedure as set forth in Exhibit "C" to this Agreement. Advance payment by a Non-Operator of his share of completed well costs shall in no event prevent such completion of a well pursuant to Option No. 2 of Article VII.D.1. and, in the event such a Non-Operator elects not to participate in completion, the sums that such Non-Operator has advanced shall not be charged with any share of the costs of any completion attempted.

In the event a Non-Operator from which a request for advance payment was made does not, within the time and manner above provided, fully satisfy the request for advance payment by depositing cash as aforesaid, then Operator, at his option, shall make a second written or telephonic request for such advance. Non-Operator shall pay for said advance as aforesaid with two (2) days from receipt of such second request.

If a Non-Operator fails to pay within two (2) days of the receipt of such second request, then:

(1)  If the advance was requested for the drilling of the initial well under Article VI.A. Non-Operator shall be deemed to have relinquished all of its leasehold and contractual rights in the Contract Area and, if assignment has been made to such Non-Operator, Non-Operator shall assign all of its said rights in and to the Contract area, within thirty (30) days of a request for such assignment, to those parties who have participated in such Drilling Operation, in the proportion that such parties elected to share the relinquished interest.

(2)  If the advance was requested for any other Drilling Operation (including completion of the initial well), Non-Operator shall be deemed to have relinquished an interest in the well to which the Drilling Operation relates computed in the same manner and with the same force and effect as if such Non-Operator had originally elected not to participate in such Operation.

Notwithstanding anything to the contrary, operator shall have the right to sue a Non-Operator who failed to pay for its proportionate share of expenses, in lieu of an assignment of all Non-Operator's leasehold and contract rights within the Contract Area, or in lieu of going Non-Consent.

If the Non-Operator fails to make such payment or furnish such security within two (2) days of the receipt of such second request, Operator shall promptly notify all other parties still participating in such Drilling Operation of the relinquishment of an interest under this provision. The parties who wish to participate in the Drilling Operation shall have five (5) days from receipt of such notice to elect to assume the costs chargeable to such relinquished interest and shall share such relinquished interest in proportion to their assumption of such relinquished interest. If the parties who wish to participate in the Drilling Operation are unwilling to assume the costs chargeable to such relinquished interest, the Drilling Operation shall be cancelled, and if the cancelled Drilling Operation involves the drilling of a test well under Article VI.A. no assignment shall be due as a consequence of the failure to pay.

## F.  NECESSARY EXPENDITURES EXCLUDE SIDETRACKING

The phase "necessary expenditures" in Article VII.D.1. (Option No. 2) on page 10 shall not be deemed to include sidetracking operations, unless specifically included in an Authority for Expenditure approved by the participating parties.

### G. ADDITIONAL CHARGES

Notwithstanding anything to the contrary contained in this Operating Agreement or the Accounting Procedure (Exhibit "C"), the following items pertaining to the Unit Area shall not be considered as administrative overhead, but the Operator shall be entitled to make a direct charge against the Joint Account for same:

> Long distance telephone call, fees for legal services, overnight mail, title costs (including curative), costs and expenses in connection with preparation and presentation of evidence and exhibits of Texas Railroad Commission hearings, preparation and handling of application to and hearings before other governmental agencies or regulatory bodies.

### H. INDEMNITY

Each Non-Operator shall indemnify and hold operator harmless against any and all liability in excess of insurance coverage carried for the joint account for injury to each such Non-Operator's officers, employees and/or agents, resulting from or in any way relating to such officer, employees and/or agents presence on a drilling rig on the Contract Area or from such person traveling by air or water between any point and such drilling rig. Such indemnity to Operator shall also apply to any other person whose presence on the rig or transportation to or from such rig is at the request of the indemnifying Non-Operator.

### I. RECOUPMENT

In the event that (i) any party hereto refuses to participate in any operation proposed under this Agreement and who is, as consequence thereof, subject to forfeiture of his interest, and (ii) such party is, at that time, in an imbalance situation with either overproduction or underproduction, then the mechanism established in Exhibit "E" to correct such imbalances shall prevail.

### J. SEVERABILITY

If any term or other provision of this Agreement is invalid, illegal or incapable of being enforced by any rule of law or public policy, all other conditions and provisions of this agreement shall nevertheless remain in full force and effect so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to any party. Upon any binding determination that any term or other provision is invalid, illegal or incapable of being enforced, the parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in an acceptable and legally enforceable manner.

### K. NO WAIVERS

No failure or delay by any party in exercising any right, power or privilege hereunder shall operate as a waiver thereof nor shall any single or partial exercise thereof preclude any other or further exercise thereof or exercise of any other right, power or privilege. The rights and remedies herein provided shall be cumulative and not exclusive of any rights or remedies provided by law.

### L. PIPELINE AND/OR GATHERING LINE CONSTRUCTION

If any party to this Agreement elects either to construct, operate or purchase or to join in the construction, operation or purchase of a pipeline, and/or gathering line to transport production from the Contract Area, then such party shall notify the other parties hereto furnishing all pertinent cost and information. Each party receiving such notice shall have the right to participate in the construction, operation and ownership of such pipeline and/or gathering line, including the right of transporting production from the Contract Area, by entering into a mutually acceptable operating agreement for the construction, acquisition and operation thereof.

### M. NON-PARTICIPATING INTERESTS AND RECORD TITLE REVISION

Anything to the contrary herein notwithstanding, the parties hereto agree to carry any non-participating oil and gas interest and/or any non-participating leasehold interest in proportion to their respective interests as set out in Exhibit "A" hereto. The parties hereto acknowledge and agree that their interests set out in Exhibit "A" hereto is subject to revisions based on title opinions and record title.

### N. BINDING ARBITRATION

Any disputes arising in connection with this agreement, including without limitation any dispute as to the construction, validity, interpretation, enforceability, or breach of this agreement, shall be exclusively and finally resolved by binding arbitration in accordance with the rules of the American Arbitration Association before a single arbitrator mutually agreed to by the parties, or if none is agreed to within fifteen (15) days of the notice by any party invoking arbitration pursuant to this provision, the arbitrator shall be selected by the American Arbitration Association upon the request of any party. The Arbitrator may engage such consultants or professionals as deemed necessary by such arbitrator. The arbitration proceedings shall be had in Shreveport, Caddo Parish, Louisiana. The costs of the arbitration proceedings (including attorneys' fees and costs) shall be borne in the manner determined by the arbitrator. Consequential, punitive, and other damages shall not be allowed between the parties hereto. The parties hereto agree to waive their rights to a jury trial, punitive damages, tort damages, attorneys' fees, costs or expenses as a result of this instrument of enforcement of the arbitration award. Judgment on any award rendered by an arbitrator may be entered in any court having jurisdiction. To the maximum extent practicable, any arbitration proceeding hereunder shall be concluded within 180 days of the filing of the dispute with the American Arbitration Association.

The arbitrator shall be empowered to impose sanctions and to take such other actions as the arbitrator deems necessary to the same extent a judge could impose sanctions or take such other actions pursuant to the Federal Rules of Civil Procedure and applicable law. At the conclusion of any arbitration proceedings, the arbitrator shall make specific written findings of fact and conclusions of law. Each party agrees to keep all disputes and arbitration proceeding strictly confidential except for disclosure of information required by applicable law. This arbitration clause shall survive the termination or the breach of this agreement. If any provision of this arbitration clause is held invalid, that invalidity shall not affect other provisions of this arbitration clause.

O. <u>DISBURSEMENT OF ROYALTIES:</u>

If Operator prepares and administers a division order for and receives and distributes the proceeds of production attributable to the interest of a Non-Operator, then Operator shall be entitled to charge that party for an appropriate monthly overhead charge for disbursing such royalty payments, in addition to the combined fixed rates specified in Exhibit "C" hereto. If through error or inadvertence Operator shall fail to pay or timely pay any royalties, overriding royalties or other payments to the parties entitled thereto, he shall not be liable in damages to the other Parties hereto for such failure.

P. <u>AREA OF MUTUAL INTEREST</u>

At the time of the execution of this Agreement, the parties hereto take cognizance of the fact that there is hereby established an Area of Mutual Interest (hereinafter sometimes referred to as "AMI"), which area is outlined on the plat attached hereto as Exhibit "A-1" hereof. In the event that any party or parties acquire any oil or gas interest (which shall be deemed to include royalties, mineral interests, and other payments out of production) or oil and gas lease within the AMI as hereinabove defined, then the non-acquiring party or parties shall have the right to acquire their proportionate interest therein in accordance with the terms and conditions as hereinafter set forth.

(1) The acquiring party or parties shall upon acquisition so notify the other party or parties in writing, setting forth the nature of the interest acquired, the description of the property, the royalty and overriding royalty burdens, the costs of acquiring the property, and any other pertinent information, therein so offering to transfer to said non-acquiring party or parties their proportionate interest upon reimbursement of their proportionate part of all costs. Said non-acquiring party or parties shall either accept or reject said offer within fifteen (15) days from the date thereof or within forty-eight (48) hours following said notice if a well is in the process of being drilled or is scheduled to be spudded within 15 days following the date of said notice (such shorter period shall be applicable with respect to wells drilled within the AMI or directly offsetting the AMI). In either event, the acquiring party shall grant to    any non-acquiring party who failed to respond a second notice period of twenty-four (24) hours in which to respond.

(2) Payment for the share of the costs of acquisition shall be made within thirty (30) days following acceptance, and failure to make such payment on a timely basis may be construed, at the option of the acquiring party, as a rejection, by written notice from the acquiring party given prior to receipt of such payment, and failure to accept the offer within the above stated time shall be considered as a rejection. If the party or parties so notified accept said offer, then the acquiring party or parties shall furnish copies of all instruments pertaining thereto, including execution and delivery of an appropriate assignment, all upon being reimbursed the proportionate costs of acquisition. However, should any non-acquiring party reject participation, the acquiring party shall notify in writing the other party or parties (other than the rejecting party or parties) of such fact and the parties so notified shall within five (5) days (or within forty-eight (48) hours if a well is in the process of being drilled) following said notice advise the acquiring party or parties of their desire to limit their participation to their proportionate share as if all parties were participating or acquire their proportionate share of the interest of the party or parties rejecting participation. Following rejection, the rejecting party or parties shall no longer have any right to acquire any interest in the area covered by that particular lease which fell within the AMI.

(3) It is further recognized by the parties hereto that notwithstanding anything herein to the contrary, should any party hereto have an opportunity to acquire an interest within the AMI in a manner other than by purchase, including but not limited to, the drilling of a well(s) thereon, the party or parties having such right shall so notify the other party or parties hereto, and the other party or parties shall have seventy-two (72) hours in which to advise the notifying party or parties of their election to participate in such acquisition by joining in performance of such act required and bearing its proportionate share of all costs and obligations to be incurred in connection therewith. Failure to accept said offer within the stated time shall be considered a rejection.

(4) If all the parties hereto elect to acquire their proportionate shares of said oil and gas interest or oil and gas lease, or to acquire an interest within the AMI as above provided, the same shall automatically become subject to this Agreement; however, if all of said parties should not elect to acquire their proportionate shares, then the said oil and gas interest or oil and gas lease or other interest acquired shall    not be subject to the terms of this Agreement, and the Contract Area as defined in Exhibit "A-1" shall   automatically be amended so as to exclude same. If, pursuant to any provision of this Agreement, title to any lease or portion thereof, or oil and gas interest covering or affecting lands within the Contract Area or the AMI shall vest in less than all Parties hereto, such lease, rights or interest shall no longer be subject to this Agreement but shall be subject to an operating agreement identical in form changed only to reflect the names and interests of the Parties. In the event title to any lease now or hereafter subject to this Agreement shall vest in only one person, such lease shall no longer be subject to this Agreement.

(5) If the oil and gas interest or oil and gas lease covers lands within and without the AMI, the acquiring party shall offer the entire oil or gas interest or oil and gas lease within and without the AMI. If each party hereto acquires its proportionate interest, the lands lying outside the AMI shall still be subject to the terms of this Article XV.P. the AMI shall thereby be enlarged. However, the provisions of this Article XV.P.5. shall be limited as to any interest acquired outside the AMI to the extent that only oil and gas leases or interests under acreage contiguous to the AMI shall be covered. If less than all of the parties acquire their proportionate interest in the oil or gas interest or oil and gas lease, the oil or gas interest or oil and gas lease so acquired shall not be subject to this

Agreement, but shall be subject to an operating agreement on a form identical to this Agreement between the parties hereto who acquire an   interest in such oil or gas interest or oil and gas lease.  The new operating agreement shall not contain an AMI provision, and the provisions of this Article XV.P. shall continue to govern acquisitions within the AMI.

(6) Any assignment made by the acquiring party shall be made free and clear of any burdens placed thereon by the acquiring party with the exception of those burdens mentioned in the Lease Purchase and Development Agreement, but otherwise only with special warranty of title.  The assignment shall be made and accepted subject to, and each assignee shall expressly assume its portion of, all of the obligations of the acquiring party.

(7) The provision of this AMI shall not apply to acquisitions as a result of a bona fide merger, consolidation, reorganization or an acquisition from a parent, subsidiary or affiliated corporation, or, as       to       individuals, from ascendant or descendants or trusts of which such parties are beneficiaries.  Neither shall it apply to sales and acquisitions between partners in a partnership or ventures in a joint venture, or to any acquisition by any party of an interest which interest prior to and at the time of such acquisition was subject to this Agreement, unless such acquisition was the renewal or extension of a lease which at the date of expiration was subject to this Agreement.  As used herein a renewal or extension of any lease means any renewal lease, extension of any existing lease covering all or any portion of or any interest in the area covered by an expiring lease taken before, or taken or contracted for within one year after, the expiration of the predecessor lease.

(8) For all purposes of this paragraph, it is understood that the proportionate interest of the parties hereto shall be as shown on Exhibit "A" as "After Payout" interest, unless otherwise revised hereinafter as a consequence of non-consent operations or other provisions.

(9) The AMI shall exist until the expiration date of the primary term of the last existing lease acquired before the completion of the Initial Test Well or the date of last production from the last producing well which includes land or lands pooled therewith which lie within the boundary of the AMI, and thereafter terminate.

## Q.  INFORMATION

Anything to the contrary hereinabove notwithstanding, it is stipulated that any non-consenting party to an operation conducted hereunder shall have no right to observe such operation or have access to information pertaining to such operation, until such time as the non-consenting party's share of the cost of such operation and the penalty therefor has been recovered by the consenting parties as provided herein.

## R.  LIMITATION ON WELL PROPOSALS

It is specifically provided that no notice shall be given under Article VI. hereof which proposes the drilling of more than one well.  Further, the provisions of Article VI, insofar as same pertains to notification by a party of its desire to drill a well, shall be suspended (1) for so long as a prior notice has been given which is still in force and effect and the period of time during which the well regarding same may be commenced has not expired, (2) for so long as a well is then being drilled hereunder or (3) in accordance with Article XV.W. pertaining to Geoscience Operations.  This Article XV.R. shall not apply under those circumstances where the well to which such notice is directed is a well which is required under the terms of a lease or contract.

## S.  OPERATOR'S LIEN – SECURITY INTEREST

Subject to the provision of Article VII.B. of this Agreement, each non-Operator grants to Operator a lien upon all of the rights, titles, and interests of each "Non-Operator, whether now existing or hereafter acquired, in and to the (1) the oil, gas, or other minerals in, on, and under the Contract Area and (2) any oil, gas, and mineral leases covering the Contract Area or any portion thereof.  In addition, each Non-Operator grants to Operator a security interest in and to all of such Non-Operator's rights, titles, interests, claims, general intangibles, proceeds, and products thereof, whether now existing or hereafter acquired, in and to (1) all oil, gas and other minerals produced from the Contract Area when produced; (2) all accounts receivable accruing or arising as a result of the sale of such oil, gas and other minerals; (3) all cash or other proceeds from the sale of such oil, gas, and other minerals once produced; and (4) all oil and gas wells and other surface and sub-surface equipment and facilities of any kind or character located on the Contract Area and the cash or other proceeds received from the sale thereof (collectively, the "Personal Property Collateral").  Some of the Personal Property Collateral is or will become fixtures on the Contract Area, and the interest of Non-Operator in and to the oil, gas and other minerals when extracted from the Contract Area and the accounts receivable accruing or arising as the result of the sale thereof shall be financed at the wellhead of the well or wells located on the Contract Area.  This Agreement (including a carbon, photographic, or other reproduction hereof) shall constitute a non-standard form financing statement under the terms of the Uniform Commercial Code of the State in which the Contract Area is located, and as such, may be filed for record in the real estate records of the county or counties in which the Contract Area is located.

## T.  MARKETING OF PRODUCTION

Operator agrees to market all Non-Operator's share of any production from the Contract Area under the same terms that Operator is marketing its share of said production; provided, however, that contracts entered into by Operator in marketing Non-Operator's share of production shall be subject to the limitations set forth in Article VI.V. hereof.  Further, Non-Operator shall be given the continuing right to participate as a signatory to any contract entered into by Operator to market production hereunder.  Notwithstanding the above, any Non-Operator may choose to separately market its proportionate share of said production by giving written notice to Operator by the 15th day of the month prior to the month in which said Non-Operator intends to separately market its production.  Conversely, if said Non-Operator again requests that Operator market its production, Non-Operator must provide written request of same by the 15th day of the month prior to the month in which Operator is again to market said Non-Operator's production.

**U.  METERING OF PRODUCTION**

In the event of transfer, sale, encumbrance or other disposition of interest within the Contract Area, which creates the necessity of separate measurement of production, the party creating the necessity for such measurement shall alone bear the cost of purchase, installation and operation of such facilities.

**V.  PLUGGING AND LEASEHOLD RESTORATION FUND**

At any time any well subject to this agreement is, in Operator's sole opinion, approaching the end of its economic life and/or its useful purpose, Operator may pre-bill the joint account an amount which is reasonably estimated to plug and abandon such well and restore the leasehold premises at the well-site location.  Such amount shall be invested in an interest bearing certificate of deposit, and the principal and interest therefrom utilized to offset the actual costs of plugging and abandonment and restoration of the leasehold premises.  In the event actual costs are less than the estimate, each working interest owner will be issued a refund of the difference, together with any accrued interest on such difference, based upon the then working interest percentage of such owner.  In the event the actual costs exceed the estimate, each owner agrees to pay its proportionate share of the expenses over and above the estimated and pre-billed amount.

**W.  GEOSCIENCE OPERATIONS**

Any party to this agreement may propose through the operator that Geoscience operations be conducted on the contract area lands.   Geoscience operations shall be defined as seismic or other geophysical work, surface geological, geochemical, gravity, magnetic surveys and other exploratory work other than the actual drilling of an oil and gas well.

As it pertains to this agreement, Geoscience work is divided into two categories.  The first is Trade Data. Trade Data shall be defined as existing data purchased from other companies or vendors.  The second category is Proprietary Data.  Proprietary Data shall be defined as new data acquired in the field by the operator.

The Proposing party wishing to conduct Geoscience operations shall furnish the non-proposing party(s) with written notice which describes the proposed Geoscience operation and the estimated cost of the operation.  Upon the receipt of this Geoscience proposal, the non-proposing party(s) shall have 30 days to notify the proposing party in writing of its decision to participate in the Geoscience operation.  The failure of the non-proposing party(s) to respond within the said 30-day period shall be deemed an election not to participate in the operation.  Thereafter, the proposing party shall be free to enter into a contract to conduct such Geoscience operation.  If less than all parties approve any proposed Geoscience operation, the proposing party shall advice those consenting parties who have elected to participate in the Geoscience operation of the total interest of the consenting parties approving such operation and its recommendation as to whether the consenting parties should proceed with the operation as proposed.   Each consenting party, within forty-eight (48) hours after receipt of such notice shall advise the proposing party in writing of its desire to either limit its participation to such party(s) interest as shown on Exhibit "A" herein or carry its proportionate part of the non-consenting party(s) interest.  The failure to respond to this notice shall be deemed an election to carry its proportionate share of a non-consenting party(s) interest.  The proposing party may, at its election withdraw such Geoscience proposal if there is insufficient participation and shall promptly notify all parties of such decision.

The operator shall supervise any Geoscience program.  Any trade data purchased shall be licensed in the operator's name.  All participating parties in the trade data shall have complete access to the data in the operator's office as per any limitations or requirements found in the license agreements controlling said trade data.

All Proprietary Data shall be owned by the party or parties who have participated in the acquisition of said data on the proportion that they have paid for the Geoscience operation.  Copies of the Proprietary Data shall be timely disseminated   by   the   party   supervising   the   Geoscience   operation   to   those   participating   parties.

A party who does not participate in a Geoscience operation (hereafter called "non-consenting party") shall not receive or have access to information, data or materials generated by such operation.  The participating parties may recover actual costs up to five hundred thousand dollars ($500,000.00) from all production established within the Prospect, but no well will have revenue diverted to pay for such Geoscience operation until that well has itself paid back from production the actual costs of drilling and completing such well.

All jointly owned geophysical, geological, and other geoscience data acquired, compiled, or generated pursuant to and after the effective date of this Agreement shall be treated as confidential for a period of Ten (10) years, and shall not be sold, traded or otherwise disposed of or divulged without the prior written consent from the parties which participated in the acquisition of such data.  In addition, Trade Data shall be subject to its license agreement and shall be handled accordingly.  If during this initial ten (10) year period all the participating parties decide to market and sell any or all of the Proprietary Data acquired during the Geoscience operation then the party supervising the Geoscience operation shall oversee the brokerage of the data.  Any income or information derived from the sale or trade of any jointly owned Data, shall be shared based on the proportionate interest of each party who participated in such Geoscience operation.  After this ten (10) year period all data and or materials acquired jointly pursuant to this agreement shall be independently owned by each party who participated in any such Geoscience operation and each participating party shall have the right to separately sell, trade, or otherwise dispose of such data without the obligation to share any remuneration received with the other participating parties.

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

ARTICLE XVI.
MISCELLANEOUS

This agreement shall be binding upon and shall inure to the benefit of the parties hereto and to their respective heirs, devisees, legal representatives, successors and assigns.

This instrument may be executed in any number of counterparts, each of which shall be considered an original for all purposes.

IN WITNESS WHEREOF, this agreement shall be effective as of ____28th____ day of __May_____ 19__99____ .

O P E R A T O R

N O N - O P E R A T O R S



OPERATING AGREEMENT

## ARTICLE XVI
## MISCELLANEOUS

This agreement shall be binding upon and shall inure to the benefit of the parties hereto and to their respective heirs, devisees, legal representatives, successors and assigns.

This instrument may be executed in any number of counter parts, each of which shall be considered an original for all purposes.

IN WITNESS WHEREOF, this agreement shall be effective as of May 28, 1999.

WITNESSES                                      OPERATOR

                                               SKLAR-TEX L.L.C.

_____               _____

_____

---

### ACKNOWLEDGEMENT

STATE OF LOUISIANA

PARISH OF CADDO

On this 15th day of June, 1999, before me came and appeared Howard F. Sklar, to me personally known, who being first duly sworn, did say he is the Manager of Sklar-Tex L.L.C., a Louisiana Limited Liability company, the Operator named in the foregoing instrument, and that he was duly authorized in such capacity to execute the foregoing instrument for and in the name and behalf of said Limited Liability Company, and further stated and acknowledged that he so signed, executed, and delivered the foregoing instrument as the free act and deed of said Limited Liability Company for the purposes and consideration therein expressed and in the capacity therein stated.

BETTYE M. LaCOUR
NOTARY PUBLIC CADDO PARISH, LA.
MY COMMISSION EXPIRES WITH LIFE

Notary Public in and for Caddo Parish, LA.

OPERATING AGREEMENT

ARTICLE XVI
MISCELLANEOUS

This agreement shall be binding upon and shall inure to the benefit of the parties hereto and to their respective heirs, devisees, legal representatives, successors and assigns.

This instrument may be executed in any number of counter parts, each of which shall be considered an original for all purposes.

IN WITNESS WHEREOF, this agreement shall be effective as of May 28, 1999.

WITNESSES

NON-OPERATOR

BOREAN OIL COMPANY

_Syda Garcia_

_CR Lewis_
C. R. Lewis/President
_Vice_

---

ACKNOWLEDGEMENT

STATE OF _TEXAS_

COUNTY OF _Nueces_

On this _23 RD_ day of _June_, 1999, before me came and appeared C. R. Lewis, to me personally known, who being first duly sworn, did say he is the Vice President of Borean Oil Company, one of the Non- Operators named in the foregoing instrument, and that he was duly authorized in such capacity to execute the foregoing instrument for and in the name and behalf of said company, and further stated and acknowledged that he so signed, executed, and delivered the foregoing instrument as the free act and deed of said company for the purposes and consideration therein expressed and in the capacity therein stated.

_Linda Colvin_
Notary Public in and for

_____

LINDA COLVIN
MY COMMISSION EXPIRES
January 13, 2003

# EXHIBIT 'A'

Attached to and made a part of that certain Operating Agreement dated May 28, 1999 between Sklar-Tex L.L.C., as Operator, and Non-Operators covering the Cass County Prospect.

1. Lands and Leasehold covered by this Operating Agreement

All lands, oil and gas leasehold interest and oil and gas interest lying within the boundaries of that certain AMI as shown on the plat designated as Exhibit A-1.

2. Restrictions as to Depths, Formations or Substances

The interests are subject to any depth restrictions contained in the leases described in Section 4.

3. Percentages of Working Interest, and addresses for notice purposes, of the parties to this agreement.

| Parties | Interests | |
|---|---|---|
| | BPO | APO |
| Sklar Exploration Company<br>P. O. Box 1753<br>Shreveport, Louisiana 71166<br>Attention: Mr. Wade Taylor<br>Phone: (318) 227-8668<br>Fax:   ( 318) 227-9012<br>Fax – CF: (318) 227-9435 | 26.31578947% | 25.00000000% |
| Jack L. Vaughn & Associates, Inc.<br>1444 El Campo<br>Dallas, Texas 75218<br>Attention: Mr. Jack Vaughn<br>Phone: (214) 750-0700<br>Fax:   (214) 750-0700 | 38.94736842% | 37.00000000% |
| Cass County Iron Company<br>P. O. Box 52<br>Hancock, Maine 04640<br>Attention: Mr. Dyer S. Wadsworth<br>Phone: (207) 422-3830<br>Fax:   (207) 422-3830 | 10.52631579% | 10.00000000% |
| Mr. Dyer S. Wadsworth<br>P. O. Box 52<br>Hancock, Maine 04640<br>Phone: (207) 422-3830<br>Fax :   (207) 422-3830 | 2.10526316% | 2.00000000% |
| Nolan Manziel<br>P. O. Box 6005<br>Tyler, Texas 75711<br>Phone: (903) 592-4315<br>Fax:   (903) 592-6655 | 3.15789474% | 3.00000000% |
| N. Paul Manziel<br>P.O. Box 6005<br>Tyler, Texas 75711<br>Phone: (903) 592-4315<br>Fax:   (903) 592-6655 | 1.05263158% | 1.00000000% |
| Manziel Management Corporation<br>P. O. Box 6005<br>Tyler, Texas 75711<br>Phone: (903) 592-4315<br>Fax:   (903) 592-6655 | 0.31578947% | 0.30000000% |
| Manziel Family Oil & Gas Partnership, LTD.<br>P. O. Box 6005<br>Tyler, Texas 75711<br>Phone: (903) 592-4315<br>Fax:   (903) 592-6655 | 2.84210526% | 2.70000000% |

| | | |
|---|---|---|
| Mr. Thomas R. Lewis<br>P. O. Box 1148<br>Aransas Pass, Texas 78336<br>Phone: (361) 758-2899<br>Fax: (361) 882-3399 | 3.15789474% | 3.00000000% |
| Mr. Jon C. Lewis<br>P. O. Box 636<br>Aransas Pass, Texas 78336<br>Phone: (361) 776-3018<br>Fax: (361) 882-3399 | 3.15789474% | 3.00000000% |
| Borean Oil Company<br>Mercantile Tower No. 112, Suite 613<br>Corpus Christi, Texas 78477<br>Attention: Mr. C. R. Lewis<br>Phone: (361) 888-4752<br>Fax: (361) 882-3399 | <u>8.42105263%</u><br>100.00000000% | <u>13.00000000%</u><br>100.00000000% |

4. Oil and Gas Leases subject to this Agreement

| Lessor | Lease Date | Gross Acres |
|---|---|---|
| Cass County Iron Company | July 31, 1997 | 971.430 |
| Emmett H. Wiley et ux | July 9, 1997 | 78.930 |
| Mary E. Hurt | July 21, 1997 | 6.070 |
| SIDCO Minerals, Inc. | July 9, 1997 | 55.500 |
| Stephen B. Secord | February 6, 1998 | 39.700 |
| Cynthia Ragan Adams, Individually and as Trustee | November 19, 1997 | 304.058 |
| Rebecca Ragan Middleton, Individually and as Trustee | November 19, 1997 | 304.058 |
| Mary C. Pate | October 10, 1997 | 16.000 |
| Buddy D. Pate | September 30, 1997 | 25.000 |
| Kenneth L. Pate et ux | September 26, 1997 | 52.000 |
| Thurman D. Sutton & Katrina M. Sutton | October 3, 1997 | 20.000 |
| Billy Joe Toombs et ux | December 22, 1998 | 127.960 |
| David W. Stewart | January 21, 1999 | 62.500 |
| Sandra S. Mann | January 21, 1999 | 62.500 |
| Sharon L. Stewart | January 21, 1999 | 62.500 |
| Robert Gary Hummel et ux | January 27, 1999 | 60.543 |
| Ruth Tyler Addington | January 27, 1999 | 62.500 |
| Arlene Rosalind Levine Bergner | March 22, 1999 | 62.500 |
| Frances Celia Levine Schimmel | March 22, 1999 | 62.500 |
| Ouida Hamilton Jenkins | January 27, 1999 | 95.533 |
| Joy Hamilton Conway | January 27, 1999 | 95.533 |
| Sidney R. Davis et ux | February 4, 1999 | 50.800 |
| Margaret Hamilton Allison | January 27, 1999 | 95.533 |
| Laurice Hamilton Gilbert | January 27, 1999 | 95.533 |
| Ethel W. Hamilton | January 27, 1999 | 95.533 |
| Shirley Hamilton Lollar | January 27, 1999 | 95.533 |
| Donald Hamilton | January 27, 1999 | 95.533 |
| Carrie Hamilton Echols | January 27, 1999 | 95.533 |
| Marie Wilson Young | January 27, 1999 | 95.533 |
| William Randolph Nichols | January 29, 1999 | 404.058 |
| Jon Sanford Nichols | January 29, 1999 | 404.058 |
| Wallace Robert Nichols, III | January 29, 1999 | 404.058 |
| Martha Bell Nichols | January 29, 1999 | 404.058 |
| Cynthia Ragan Adams, Individually and as Trustee | February 5, 1999 | 100.000 |
| Rebecca Ragan Middleton, Individually and as Trustee | February 5, 1999 | 100.000 |
| Danny Anderson et ux | March 26, 1999 | 7.765 |
| L. G. Anderson et ux | March 18, 1999 | 37.215 |
| S. E. Cargile et ux | March 8, 1999 | 49.500 |
| Faye L. Livingston | March 5, 1999 | 50.000 |

ALSO: All leases acquired from Trans-Texas Resources.
(Assignment recorded in Volume 1082, Pages 824-837)

EXHIBIT "A-1"

Attached to and made a part of that certain Operating Agreement dated May 28, 1999 between Sklar-Tex L.L.C. as Operator and Cass County Iron Company et al. as Non-Operators.



CutePDF - www.tevio.com

COPAS – 1984 – ONSHORE
Recommended by the Council
of Petroleum Accountants
Societies

601,   BOX 800
TULSA OK 74101

COPAS

# EXHIBIT   " C "

Attached to and made a part of that certain Operating Agreement dated May 28, 1999 between Sklar-Tex L.L.C. as Operator and Cass County Iron Company et al. as Non-Operators

# ACCOUNTING PROCEDURE
# JOINT OPERATIONS

## I. GENERAL PROVISIONS

1. **Definitions**

"Joint Property" shall mean the real and personal property subject to the agreement to which this Accounting Procedure is attached.
"Joint Operations" shall mean all operations necessary or proper for the development, operation, protection and maintenance of the Joint Property.
"Joint Account" shall mean the account showing the charges paid and credits received in the conduct of the Joint Operations and which are to be shared by the Parties.
"Operator" shall mean the party designated to conduct the Joint Operations.
"Non-Operators" shall mean the Parties to this agreement other than the Operator.
"Parties" shall mean Operator and Non-Operators.
"First Level Supervisors" shall mean those employees whose primary function in Joint Operations is the direct supervision of other employees and/or contract labor directly employed on the Joint Property in a field operating capacity.
"Technical Employees" shall mean those employees having special and specific engineering, geological or other professional skills, and whose primary function in Joint Operations is the handling of specific operating conditions and problems for the benefit of the Joint Property.
"Personal Expenses" shall mean travel and other reasonable reimbursable expenses of Operator's employees.
"Material" shall mean personal property, equipment or supplies acquired or held for use on the Joint Property.
"Controllable Material" shall mean Material which at the time is so classified in the Material Classification Manual as most recently recommended by the Council of Petroleum Accountants Societies.

2. **Statement and Billings**

Operator shall bill Non-Operators on or before the last day of each month for their proportionate share of the Joint Account for the preceding month. Such bills will be accompanied by statements which identify the authority for expenditure, lease or facility, and all charges and credits summarized by appropriate classifications of investment and expense except that items of Controllable Material and unusual charges and credits shall be separately identified and fully described in detail.

3. **Advances and Payments by Non-Operators**

   A. Unless otherwise provided for in the agreement, the Operator may require the Non-Operators to advance their share of estimated cash outlay for the succeeding month's operation within fifteen (15) days after receipt of the billing or by the first day of the month for which the advance is required, whichever is later. Operator shall adjust each monthly billing to reflect advances received from the Non-Operators.

   B. Each Non-Operator shall pay its proportion of all bills within fifteen (15) days after receipt. If payment is not made within such time, the unpaid balance shall bear interest monthly at the prime rate in effect at Bank One Shreveport, LA on the first day of the month in which delinquency occurs plus 1% or the maximum contract rate permitted by the applicable usury laws in the state in which the Joint Property is located, whichever is the lesser, plus attorney's fees, court costs, and other costs in connection with the collection of unpaid amounts.

4. **Adjustments**

Payment of any such bills shall not prejudice the right of any Non-Operator to protest or question the correctness thereof; provided, however, all bills and statements rendered to Non-Operators by Operator during any calendar year shall conclusively be presumed to be true and correct after twenty-four (24) months following the end of any such calendar year, unless within the said twenty-four (24) month period a Non-Operator takes written exception thereto and makes claim on Operator for adjustment. No adjustment favorable to Operator shall be made unless it is made within the same prescribed period. The provisions of this paragraph shall not prevent adjustments resulting from a physical inventory of Controllable Material as provided for in Section V.

COPYRIGHT© 1985 by the Council of Petroleum Accountants Societies.



5. **Audits**

    A.  A Non-Operator, upon notice in writing to Operator and all other Non-Operators, shall have the right to audit Operator's accounts and records relating to the Joint Account for any calendar year within the twenty-four (24) month period following the end of such calendar year; provided, however, the making of an audit shall not extend the time for the taking of written exception to and the adjustments of accounts as provided for in Paragraph 4 of this Section I. Where there are two or more Non-Operators, the Non-Operators shall make every reasonable effort to conduct a joint audit in a manner which will result in a minimum of inconvenience to the Operator. Operator shall bear no portion of the Non-Operators' audit cost incurred under this paragraph unless agreed to by the Operator. The audits shall not be conducted more than once each year without prior approval of Operator, except upon the resignation or removal of the Operator, and shall be made at the expense of those Non-Operators approving such audit.

    B.  The Operator shall reply in writing to an audit report within 180 days after receipt of such report.

6. **Approval By Non-Operators**

    Where an approval or other agreement of the Parties or Non-Operators is expressly required under other sections of this Accounting Procedure and if the agreement to which this Accounting Procedure is attached contains no contrary provisions in regard thereto, Operator shall notify all Non-Operators of the Operator's proposal; and the agreement or approval of a majority in interest of the Non-Operators shall be controlling on all Non-Operators.

**II. DIRECT CHARGES**

Operator shall charge the Joint Account with the following items:

1. **Ecological and Environmental**

    Costs incurred for the benefit of the Joint Property as a result of governmental or regulatory requirements to satisfy environmental considerations applicable to the Joint Operations. Such costs may include surveys of an ecological or archaeological nature and pollution control procedures as required by applicable laws and regulations.

2. **Rentals and Royalties**

    Lease rentals and royalties paid by Operator for the Joint Operations.

3. **Labor**

    A.  (1)  Salaries and wages of Operator's field employees directly employed on the Joint Property in the conduct of Joint Operations.

        (2)  Salaries of First Level Supervisors in the field.

        (3)  Salaries and wages of Technical Employees directly employed on the Joint Property if such charges are excluded from the overhead rates.

        (4)  Salaries and wages of Technical Employees either temporarily or permanently assigned to and directly employed in the operation of the Joint Property if such charges are excluded from the overhead rates.

    B.  Operator's cost of holiday, vacation, sickness and disability benefits and other customary allowances paid to employees whose salaries and wages are chargeable to the Joint Account under Paragraph 3A of this Section II. Such costs under this Paragraph 3B may be charged on a "when and as paid basis" or by "percentage assessment" on the amount of salaries and wages chargeable to the Joint Account under Paragraph 3A of this Section II. If percentage assessment is used, the rate shall be based on the Operator's cost experience.

    C.  Expenditures or contributions made pursuant to assessments imposed by governmental authority which are applicable to Operator's costs chargeable to the Joint Account under Paragraphs 3A and 3B of this Section II.

    D.  Personal Expenses of those employees whose salaries and wages are chargeable to the Joint Account under Paragraph 3A of this Section II.

4. **Employee Benefits**

    Operator's current costs of established plans for employees' group life insurance, hospitalization, pension, retirement, stock purchase, thrift, bonus, and other benefit plans of a like nature, applicable to Operator's labor cost chargeable to the Joint Account under Paragraphs 3A and 3B of this Section II shall be Operator's actual cost not to exceed the percent most recently recommended by the Council of Petroleum Accountants Societies.

5. **Material**

    Material purchased or furnished by Operator for use on the Joint Property as provided under Section IV. Only such Material shall be purchased for or transferred to the Joint Property as may be required for immediate use and is reasonably practical and consistent with efficient and economical operations. The accumulation of surplus stocks shall be avoided.

6. **Transportation**

    Transportation of employees and Material necessary for the Joint Operations shall be charged at actual cost incurred by Operator. ~~but subject to the following limitations:~~

    ~~A.   If Material is moved to the Joint Property from the Operator's warehouse or other properties, no charge shall be made to the Joint Account for a distance greater than the distance from the nearest reliable supply store where like material is normally available or railway receiving point nearest the Joint Property unless agreed to by the Parties.~~

COPAS

~~B.   If surplus Material is moved to Operator's warehouse or other storage point, no charge shall be made to the Joint Account for a distance greater than the distance to the nearest reliable supply store where like material is normally available, or railway receiving point nearest the Joint Property unless agreed to by the Parties. No charge shall be made to the Joint Account for moving Material to other properties belonging to Operator, unless agreed to by the Parties.~~

~~C.   In the application of subparagraphs A and B above, the option to equalize or charge actual trucking cost is available when the actual charge is $400 or less excluding accessorial charges. The $400 will be adjusted to the amount most recently recommended by the Council of Petroleum Accountants Societies.~~

7.   **Services**

The cost of contract services, equipment and utilities provided by outside sources, except services excluded by Paragraph 10 of Section II and Paragraph i, ii, and iii, of Section III. The cost of professional consultant services and contract services of technical personnel directly engaged on the Joint Property if such charges are excluded from the overhead rates. The cost of professional consultant services or contract services of technical personnel not directly engaged on the Joint Property shall not be charged to the Joint Account unless previously agreed to by the Parties.

8.   **Equipment and Facilities Furnished By Operator**

A.   Operator shall charge the Joint Account for use of Operator owned equipment and facilities at rates commensurate with costs of ownership and operation. Such rates shall include costs of maintenance, repairs, other operating expense, insurance, taxes, depreciation, and interest on gross investment less accumulated depreciation not to exceed _____ fifteen   percent ( 15   %) per annum. Such rates shall not exceed average commercial rates currently prevailing in the immediate area of the Joint Property.

B.   In lieu of charges in paragraph 8A above, Operator may elect to use average commercial rates prevailing in the immediate area of the Joint Property less 20%. For automotive equipment, Operator may elect to use rates published by the Petroleum Motor Transport Association.

9.   **Damages and Losses to Joint Property**

All costs or expenses necessary for the repair or replacement of Joint Property made necessary because of damages or losses incurred by fire, flood, storm, theft, accident, or other cause, except those resulting from Operator's gross negligence or willful misconduct. Operator shall furnish Non-Operator written notice of damages or losses incurred as soon as practicable after a report thereof has been received by Operator.

10.   **Legal Expense**

Expense of handling, investigating and settling litigation or claims, discharging of liens, payment of judgements and amounts paid for settlement of claims incurred in or resulting from operations under the agreement or necessary to protect or recover the Joint Property, ~~except that no charge for services of Operator's legal staff or fees or expense of outside attorneys shall be made unless previously agreed to by the Parties. All other legal expense is considered to be covered by the overhead provisions of Section III unless otherwise agreed to by the Parties, except as provided in Section II, Paragraph~~ 9, and the costs and expenses incurred in connection with hearings and other matters before governmental bodies and agencies and costs and expenses incurred in examining and curing title, except that no charge for service of Operator's legal staff shall be made.

11.   **Taxes**

All taxes of every kind and nature assessed or levied upon or in connection with the Joint Property, the operation thereof, or the production therefrom, and which taxes have been paid by the Operator for the benefit of the Parties. If the ad valorem taxes are based in whole or in part upon separate valuations of each party's working interest, then notwithstanding anything to the contrary herein, charges to the Joint Account shall be made and paid by the Parties hereto in accordance with the tax value generated by each party's working interest.

12.   **Insurance**

Net premiums paid for insurance required to be carried for the Joint Operations for the protection of the Parties. In the event Joint Operations are conducted in a state in which Operator may act as self-insurer for Worker's Compensation and/or Employers Liability under the respective state's laws, Operator may, at its election, include the risk under its self-insurance program and in that event, Operator shall include a charge at Operator's cost not to exceed manual rates.

13.   **Abandonment and Reclamation**

Costs incurred for abandonment of the Joint Property, including costs required by governmental or other regulatory authority.

14.   **Communications**

Cost of acquiring, leasing, installing, operating, repairing and maintaining communication systems, including radio and microwave facilities directly serving the Joint Property. In the event communication facilities/systems serving the Joint Property are Operator owned, charges to the Joint Account shall be made as provided in Paragraph 8 of this Section II.

15.   **Other Expenditures**

Any other expenditure not covered or dealt with in the foregoing provisions of this Section II, or in Section III and which is of direct benefit to the Joint Property and is incurred by the Operator in the necessary and proper conduct of the Joint Operations.

**COPAS**

## III. OVERHEAD

**1.   Overhead – Drilling and Producing Operations**

i.   As compensation for administrative, supervision, office services and warehousing costs, Operator shall charge drilling and producing operations on either:

☒ Fixed Rate Basis, Paragraph 1A, or
(  ) Percentage Basis, Paragraph 1B

Unless otherwise agreed to by the Parties, such charge shall be in lieu of costs and expenses of all offices and salaries or wages plus applicable burdens and expenses of all personnel, except those directly chargeable under Paragraph 3A, Section II. The cost and expense of services from outside sources in connection with matters of taxation, traffic, accounting or matters before or involving governmental agencies shall be considered as included in the overhead rates provided for in the above selected Paragraph of this Section III unless such cost and expense are agreed to by the Parties as a direct charge to the Joint Account.

ii.  The salaries, wages and Personal Expenses of Technical Employees and/or the cost of professional consultant services and contract services of technical personnel directly employed on the Joint Property:

(  ) shall be covered by the overhead rates, or
☒ shall not be covered by the overhead rates.

iii. The salaries, wages and Personal Expenses of Technical Employees and/or costs of professional consultant services and contract services of technical personnel either temporarily or permanently assigned to and directly employed in the operation of the Joint Property:

(  ) shall be covered by the overhead rates, or
☒ shall not be covered by the overhead rates.

**A.   Overhead – Fixed Rate Basis**

(1)  Operator shall charge the Joint Account at the following rates per well per month:

Drilling Well Rate $ __6,500.00__
    (Prorated for less than a full month)

Producing Well Rate $ __650.00__

(2)  Application of Overhead – Fixed Rate Basis shall be as follows:

(a)  Drilling Well Rate

(1)  Charges for drilling wells shall begin on the date the well is spudded and terminate on the date the drilling rig, completion rig, or other units used in completion of the well is released, whichever is later, except that no charge shall be made during suspension of drilling or completion operations for fifteen (15) or more consecutive calendar days.

(2)  Charges for wells undergoing any type of workover or recompletion for a period of five (5) consecutive work days or more shall be made at the drilling well rate. Such charges shall be applied for the period from date workover operations, with rig or other units used in workover, commence through date of rig or other unit release, except that no charge shall be made during suspension of operations for fifteen (15) or more consecutive calendar days.

(b)  Producing Well Rates

(1)  An active well either produced or injected into for any portion of the month shall be considered as a one-well charge for the entire month.

(2)  Each active completion in a multi-completed well in which production is not commingled down hole shall be considered as a one-well charge providing each completion is considered a separate well by the governing regulatory authority.

(3)  An inactive gas well shut in because of overproduction or failure of purchaser to take the production shall be considered as a one-well charge providing the gas well is directly connected to a permanent sales outlet.

(4)  A one-well charge shall be made for the month in which plugging and abandonment operations are completed on any well. This one-well charge shall be made whether or not the well has produced except when drilling well rate applies.

(5)  All other inactive wells (including but not limited to inactive wells covered by unit allowable, lease allowable, transferred allowable, etc.) shall not qualify for an overhead charge.

(3)  The well rates shall be adjusted as of the first day of April each year following the effective date of the agreement to which this Accounting Procedure is attached. The adjustment shall be computed by multiplying the rate currently in use by the percentage increase or decrease in the average weekly earnings of Crude Petroleum and Gas Production Workers for the last calendar year compared to the calendar year preceding as shown by the index of average weekly earnings of Crude Petroleum and Gas Production Workers as published by the United States Department of Labor, Bureau of Labor Statistics, or the equivalent Canadian index as published by Statistics Canada, as applicable. The adjusted rates shall be the rates currently in use, plus or minus the computed adjustment.

B.   Overhead – Percentage Basis

(1)   Operator shall charge the Joint Account at the following rates:

COPAS

~~(a)  Development~~

~~_____ Percent (_____ %) of the cost of development of the Joint Property exclusive of costs provided under Paragraph 10 of Section II and all salvage credits.~~

~~(b)  Operating~~

~~_____ Percent (_____ %) of the cost of operating the Joint Property exclusive of costs provided under Paragraphs 2 and 10 of Section II, all salvage credits, the value of injected substances purchased for secondary recovery and all taxes and assessments which are levied, assessed and paid upon the mineral interest in and to the Joint Property.~~

~~(2)  Application of Overhead - Percentage Basis shall be as follows:~~

~~For the purpose of determining charges on a percentage basis under Paragraph 1B of this Section III, development shall include all costs in connection with drilling, redrilling, deepening, or any remedial operations on any or all wells involving the use of drilling rig and crew capable of drilling to the producing interval on the Joint Property; also, preliminary expenditures necessary in preparation for drilling and expenditures incurred in abandoning when the well is not completed as a producer, and original cost of construction or installation of fixed assets, the expansion of fixed assets and any other project clearly discernible as a fixed asset, except Major Construction as defined in Paragraph 2 of this Section III. All other costs shall be considered as operating.~~

2.  **Overhead – Major Construction**

To compensate Operator for overhead costs incurred in the construction and installation of fixed assets, the expansion of fixed assets, and any other project clearly discernible as a fixed asset required for the development and operation of the Joint Property, Operator shall either negotiate a rate prior to the beginning of construction, or shall charge the Joint Account for overhead based on the following rates for any Major Construction project in excess of $ _25,000.00_ :

A. ___3___ % of first $100,000 or total cost if less, plus

B. ___2___ % of costs in excess of $100,000 but less than $1,000,000, plus

C. ___1___ % of costs in excess of $1,000,000.

Total cost shall mean the gross cost of any one project. For the purpose of this paragraph, the component parts of a single project shall not be treated separately and the cost of drilling and workover wells and artificial lift equipment shall be excluded.

3.  **Catastrophe Overhead**

To compensate Operator for overhead costs incurred in the event of expenditures resulting from a single occurrence due to oil spill, blowout, explosion, fire, storm, hurricane, or other catastrophes as agreed to by the Parties, which are necessary to restore the Joint Property to the equivalent condition that existed prior to the event causing the expenditures, Operator shall either negotiate a rate prior to charging the Joint Account or shall charge the Joint Account for overhead based on the following rates:

A. ___3___ % of total costs through $100,000; plus

B. ___2___ % of total costs in excess of $100,000 but less than $1,000,000; plus

C. ___1___ % of total costs in excess of $1,000,000.

Expenditures subject to the overheads above will not be reduced by insurance recoveries, and no other overhead provisions of this Section III shall apply.

4.  **Amendment of Rates**

The overhead rates provided for in this Section III may be amended from time to time only by mutual agreement between the Parties hereto if, in practice, the rates are found to be insufficient or excessive.

### IV. PRICING OF JOINT ACCOUNT MATERIAL PURCHASES, TRANSFERS AND DISPOSITIONS

Operator is responsible for Joint Account Material and shall make proper and timely charges and credits for all Material movements affecting the Joint Property. Operator shall provide all Material for use on the Joint Property; however, at Operator's option, such Material may be supplied by the Non-Operator. Operator shall make timely disposition of idle and/or surplus Material, such disposal being made either through sale to Operator or Non-Operator, division in kind, or sale to outsiders. Operator may purchase, but shall be under no obligation to purchase, interest of Non-Operators in surplus condition A or B Material. The disposal of surplus Controllable Material not purchased by the Operator shall be agreed to by the Parties.

1.  **Purchases**

Material purchased shall be charged at the price paid by Operator after deduction of all discounts received. In case of Material found to be defective or returned to vendor for any other reasons, credit shall be passed to the Joint Account when adjustment has been received by the Operator.

2.  **Transfers and Dispositions**

Material furnished to the Joint Property and Material transferred from the Joint Property or disposed of by the Operator, unless otherwise agreed to by the Parties, shall be priced on the following basis exclusive of cash discounts:



A. New Material (Condition A)

   (1) Tubular Goods Other than Line Pipe

      (a) Tubular goods, sized 2⅜ inches OD and larger, except line pipe, shall be priced at Eastern mill published carload base prices effective as of date of movement plus transportation cost using the 80,000 pound carload weight basis to the railway receiving point nearest the Joint Property for which published rail rates for tubular goods exist. If the 80,000 pound rail rate is not offered, the 70,000 pound or 90,000 pound rail rate may be used. Freight charges for tubing will be calculated from Lorain, Ohio and casing from Youngstown, Ohio.

      (b) For grades which are special to one mill only, prices shall be computed at the mill base of that mill plus transportation cost from that mill to the railway receiving point nearest the Joint Property as provided above in Paragraph 2.A.(1)(a). For transportation cost from points other than Eastern mills, the 30,000 pound Oil Field Haulers Association interstate truck rate shall be used.

      (c) Special end finish tubular goods shall be priced at the lowest published out-of-stock price, f.o.b. Houston, Texas, plus transportation cost, using Oil Field Haulers Association interstate 30,000 pound truck rate, to the railway receiving point nearest the Joint Property.

      (d) Macaroni tubing (size less than 2⅜ inch OD) shall be priced at the lowest published out-of-stock prices f.o.b. the supplier plus transportation costs, using the Oil Field Haulers Association interstate truck rate per weight of tubing transferred, to the railway receiving point nearest the Joint Property.

   (2) Line Pipe

      (a) Line pipe movements (except size 24 inch OD and larger with walls ¾ inch and over) 30,000 pounds or more shall be priced under provisions of tubular goods pricing in Paragraph A.(1)(a) as provided above. Freight charges shall be calculated from Lorain, Ohio.

      (b) Line pipe movements (except size 24 inch OD and larger with walls ¾ inch and over) less than 30,000 pounds shall be priced at Eastern mill published carload base prices effective as of date of shipment, plus 20 percent, plus transportation costs based on freight rates as set forth under provisions of tubular goods pricing in Paragraph A.(1)(a) as provided above. Freight charges shall be calculated from Lorain, Ohio.

      (c) Line pipe 24 inch OD and over and ¾ inch wall and larger shall be priced f.o.b. the point of manufacture at current new published prices plus transportation cost to the railway receiving point nearest the Joint Property.

      (d) Line pipe, including fabricated line pipe, drive pipe and conduit not listed on published price lists shall be priced at quoted prices plus freight to the railway receiving point nearest the Joint Property or at prices agreed to by the Parties.

   (3) Other Material shall be priced at the current new price, in effect at date of movement, as listed by a reliable supply store nearest the Joint Property, or point of manufacture, plus transportation costs, if applicable, to the railway receiving point nearest the Joint Property.

   (4) Unused new Material, except tubular goods, moved from the Joint Property shall be priced at the current new price, in effect on date of movement, as listed by a reliable supply store nearest the Joint Property, or point of manufacture, plus transportation costs, if applicable, to the railway receiving point nearest the Joint Property. Unused new tubulars will be priced as provided above in Paragraph 2.A (1) and (2).

B. Good Used Material (Condition B)

Material in sound and serviceable condition and suitable for reuse without reconditioning:

   (1) Material moved to the Joint Property

      At seventy-five percent (75%) of current new price, as determined by Paragraph A.

   (2) Material used on and moved from the Joint Property

      (a) At seventy-five percent (75%) of current new price, as determined by Paragraph A, if Material was originally charged to the Joint Account as new Material or

      (b) At sixty-five percent (65%) of current new price, as determined by Paragraph A, if Material was originally charged to the Joint Account as used Material.

   (3) Material not used on and moved from the Joint Property

      At seventy-five percent (75%) of current new price as determined by Paragraph A.

The cost of reconditioning, if any, shall be absorbed by the transferring property.

C. Other Used Material

   (1) Condition C

      Material which is not in sound and serviceable condition and not suitable for its original function until after reconditioning shall be priced at fifty percent (50%) of current new price as determined by Paragraph A. The cost of reconditioning shall be charged to the receiving property, provided Condition C value plus cost of reconditioning does not exceed Condition B value.

(2) Condition D

Material, excluding junk, no longer suitable for its original purpose, but usable for some other purpose shall be priced on a basis commensurate with its use. Operator may dispose of Condition D Material under procedures normally used by Operator without prior approval of Non-Operators.

(a) Casing, tubing, or drill pipe used as line pipe shall be priced as Grade A and B seamless line pipe of comparable size and weight. Used casing, tubing or drill pipe utilized as line pipe shall be priced at used line pipe prices.

(b) Casing, tubing or drill pipe used as higher pressure service lines than standard line pipe, e.g. power oil lines, shall be priced under normal pricing procedures for casing, tubing, or drill pipe. Upset tubular goods shall be priced on a non upset basis.

(3) Condition E

Junk shall be priced at prevailing prices. Operator may dispose of Condition E Material under procedures normally utilized by Operator without prior approval of Non-Operators.

D. Obsolete Material

Material which is serviceable and usable for its original function but condition and/or value of such Material is not equivalent to that which would justify a price as provided above may be specially priced as agreed to by the Parties. Such price should result in the Joint Account being charged with the value of the service rendered by such Material.

E. Pricing Conditions

(1) Loading or unloading costs may be charged to the Joint Account at ~~the rate of twenty-five cents (25¢) per hundred weight~~ on all tubular goods movements, in lieu of actual loading or unloading costs sustained at the stocking point. The above rate shall be adjusted as of the first day of April each year following January 1, 1985 by the same percentage increase or decrease used to adjust overhead rates in Section III, Paragraph 1.A(3). Each year, the rate calculated shall be rounded to the nearest cent and shall be the rate in effect until the first day of April next year. Such rate shall be published each year by the Council of Petroleum Accountants Societies. *(handwritten: actual costs incurred by operator)*

(2) Material involving erection costs shall be charged at applicable percentage of the current knocked-down price of new Material.

3. Premium Prices

Whenever Material is not readily obtainable at published or listed prices because of national emergencies, strikes or other unusual causes over which the Operator has no control, the Operator may charge the Joint Account for the required Material at the Operator's actual cost incurred in providing such Material, in making it suitable for use, and in moving it to the Joint Property; provided notice in writing is furnished to Non-Operators of the proposed charge prior to billing Non-Operators for such Material. Each Non-Operator shall have the right, by so electing and notifying Operator within ten days after receiving notice from Operator, to furnish in kind all or part of his share of such Material suitable for use and acceptable to Operator. ~~Provided, however, if a non-operator elects to furnish material in kind, such material must (a) meet the quality specifications set by Operator, and (b) be~~ *(handwritten: such material must (a) meet the quality specifications set by Operator, and (b) be)*

4. Warranty of Material Furnished By Operator *(handwritten: inspected by Operator with inspection costs to be billed to the Joint Account.)*

Operator does not warrant the Material furnished. In case of defective Material, credit shall not be passed to the Joint Account until adjustment has been received by Operator from the manufacturers or their agents.

## V. INVENTORIES

The Operator shall maintain detailed records of Controllable Material.

1. Periodic Inventories, Notice and Representation

At reasonable intervals, inventories shall be taken by Operator of the Joint Account Controllable Material. Written notice of intention to take inventory shall be given by Operator at least thirty (30) days before any inventory is to begin so that Non-Operators may be represented when any inventory is taken. Failure of Non-Operators to be represented at an inventory shall bind Non-Operators to accept the inventory taken by Operator.

2. Reconciliation and Adjustment of Inventories

Adjustments to the Joint Account resulting from the reconciliation of a physical inventory shall be made within six months following the taking of the inventory. Inventory adjustments shall be made by Operator to the Joint Account for overages and shortages, but, Operator shall be held accountable only for shortages due to lack of reasonable diligence.

3. Special Inventories

Special inventories may be taken whenever there is any sale, change of interest, or change of Operator in the Joint Property. It shall be the duty of the party selling to notify all other Parties as quickly as possible after the transfer of interest takes place. In such cases, both the seller and the purchaser shall be governed by such inventory. In cases involving a change of Operator, all Parties shall be governed by such inventory.

4. Expense of Conducting Inventories

A. The expense of conducting periodic inventories shall not be charged to the Joint Account unless agreed to by the Parties.

B. The expense of conducting special inventories shall be charged to the Parties requesting such inventories, except inventories required due to change of Operator shall be charged to the Joint Account.

## EXHIBIT "D"

Operator shall carry the following insurance with the limits stipulated below for the joint account. Operator shall have the right to charge the joint account premiums for the insurance coverage required by this Exhibit. Such premiums shall be allocated to the joint account using a fair and reasonable method based on the nature of the operations covered by this Agreement. Non-operating working interest owners shall be named as additional insured on the liability policies. This insurance shall be primary. Certificates of insurance will be provided upon request.

I.    <u>WORKERS' COMPENSATION AND EMPLOYER'S LIABILITY</u>

     A.    Workers' Compensation and Employer's Liability Insurance covering the employees of Operator engaged in operations hereunder in compliance with the applicable State and Federal Laws.

     B.    Extension of Coverage B of policy to provide for not less than $500,000 for death or injury to one person in any one accident.

II.    <u>COMPREHENSIVE GENERAL LIABILITY</u>

     Coverage for all operations conducted hereunder by Operator for the Joint Account with a combined single limit each occurrence/aggregate of $2,000,000 for bodily injury and property damage. Said Comprehensive General Liability Insurance shall include contractual liability coverage.

III.    <u>AUTOMOBILE LIABILITY</u>

     Coverage shall include owned, non-owned and hired vehicles. Limit $500,000 combined single limit each occurrence for bodily injury and property damage.

IV.    <u>EXCESS LIABILITY</u>

     Operator shall carry excess liability insurance in an amount necessary to provide a total of $10,000,000 coverage for both Automobile Liability and Comprehensive General Liability.

V.    <u>EXTRA EXPENSE LIABILITY</u>

     Operator's Extra Expense coverage including control of well, seepage, pollution and contamination coverage, cleanup and/or containment coverage, redrilling and/or restoring, shall be carried by Operator, subject to limit(s) as shown below and subject to deductible not to exceed $25,000 per occurrence.

Liability Limit: .$5,000,000

     Any party, at its own expense, may carry its own coverage for Extra Expense Liability Insurance with limits as set forth in this Section V. Any party so electing must notify Operator of such election prior to commencement of operations and provide a certificate of insurance evidencing the appropriate limits of liability. Upon timely notification such party will not be charged by Operator for the coverage.

ANY PARTY, at its own expense, may acquire such additional insurance as it may deem necessary to protect its own interest against claims, losses, damages or destruction to property arising out of operations hereunder.

## EXHIBIT "E"

## GAS BALANCING AGREEMENT

Subject to and under the terms of the above described Operating Agreement the parties hereto own and are entitled to share in the oil and gas produced from the wells completed on the Joint Operating Area described in the Operating Agreement (the "JOA").

Each party shall have the right, but not the obligation, to make arrangements to sell or utilize its share of the gas produced from said JOA.  However, one or more of the parties may be unable to take or market its interest in the gas production from time to time; therefore, to permit any party to produce and dispose of its interest in the gas production from the JOA with as much flexibility as possible, the parties hereto agree to the storage and balancing agreement herein set forth.

1.

Subject to the provisions of the Operating Agreement to which this Exhibit is attached, during the period or periods when any party hereto has no market for, or its purchaser is unable to take or if any party elects not to take its share of gas, the other parties, or any of them, shall be entitled to produce and take said share, and each of such taking parties shall have the right to take all or any part of its pro rata share thereof, said pro rata share being based on the ratio of its participation percentage under this Operating Agreement to the participation percentages of all taking parties.  All parties hereto shall share in and own the condensate recovered at the surface in accordance with their respective interest, but each party taking such gas shall own all of the gas delivered to its purchaser.  Any party whose share of gas is not marketed shall be credited with gas in storage equal to its share of the gas produced, less its share of the gas used in lease operation, vented or lost.  Operator shall maintain a current account of the gas balance between the parties and shall furnish all parties hereto monthly statements showing the total quantity of gas produced, used in lease operations, vented or lost, and the total quantity of condensate recovered.

2.

After notice to Operator, any party may begin taking or delivering its share of the gas produced.  In addition to its share, each party, until it has recovered its gas in storage and balanced its gas account, shall be entitled to take or deliver a volume of gas equal to fifty percent (50%) of each overproduced party's share of gas produced.  If more than one party is entitled to the stated volume of the overproduced parties' share of gas, each shall have the right to take all or any part of its pro rata share thereof, said pro rata share being based on the ration of its participation percentage under this Operating Agreement to the participation percentages of all entitled parties.  Each party shall at all times use its best efforts to regulate its takes and deliveries from the Unit Area so the lease will not be shut-in for overproducing the allowable, if any, assigned thereto by the regulatory body having jurisdiction.

3.

At all times while gas is produced from the Contract Area, any party taking or marketing gas shall furnish to the Operator monthly reports of the volumes of gas delivered to its purchaser during the preceding month and to the revenue attributable thereto; and any such party shall pay to the Operator a percentage of the proceeds of such sale equal to the aggregate percentage of any and all royalties and overriding royalties which are payable on gas produced by any such party, and Operator will, in turn, make

settlement for all royalties and overriding royalties which are payable on gas produced from the Contract Area. In the event that the total royalties and overriding royalties so paid to the Operator be insufficient to discharge royalty and overriding royalty obligations on gas produced and marketed from the Contract Area, then any such deficiency will be born by the party whose interest is burdened by the royalty or overriding royalty as to which the deficiency was asserted. Any party or parties contributing separate leases to the Contract Area shall furnish the Operator with division order title opinions on which Operator shall be entitled to rely in making distribution of royalties and overriding royalties share of production of liquid hydrocarbons recovered from the gas by lease equipment.

## 4.

Any party producing and taking or delivering gas to the purchaser shall pay any and all production taxes due on such gas.

## 5.

Nothing herein shall be construed to deny any party the right, from time to time, to produce and take or deliver to the purchaser its full share of the allowable gas production to meet the deliverability tests required by its purchaser.

## 6.

Should production of gas from any reservoir or producing formation of each wellbore be permanently discontinued before the gas account is balanced, cash settlement will be made between the underproduced and overproduced parties. In making such cash settlement, each overproduced party shall make payment to Operator along with sufficient accounting documentation as hereinafter described and Operator shall make disbursement to the underproduced parties. In making such settlement, the underproduced party or parties will be paid a sum of money by the overproduced party or parties attributable to the overproduction which said overproduced party sold or took but did not sell, less applicable production taxes and royalties theretofore paid, at the price received by the overproduced party at the time and from time to time the overproduced party delivered and sold that portion of production that was attributable to the share of the underproduced party. For gas taken but not sold, settlement shall be based on the price which the taking party would have received under its purchase agreement if the gas had been sold at the time taken, or, in the absence of a contract, at the weighted average price of the parties selling gas at the time the gas was taken.

In the event any gas sold under this Agreement is subject to a regulated price by the FERC or a successor agency or governmental authority with jurisdiction thereover, the price basis shall be the rate collected, from time to time, which is not subject to possible refund, as provided by NGPA or as required by the FERC pursuant to the final determination, order, or settlement applicable to the gas sold from any reservoir (other than the general refund obligations of 18 CFR Section 273.301 or its successor regulation and the potential refund obligations arising from the lack of absolute finality provided by Section 503 (d) (1) and (2) of the NGPA plus any additional collected amount to be accounted for at such time as final determination is made with respect thereto but shall not exceed their contractually entitled price of the underproduced party. Notwithstanding the foregoing, should the underproduced party desire to receive such additional collected amount which is subject to possible refund pending the issuance of said final determination, order, or settlement, such underproduced party shall be entitled to the payment thereof from the overproduced party or parties upon the underproduced party executing and delivering to said overproduced party or parties an acceptable agreement in which the underproduced party agrees to repay to the overproduced party or parties that amount so paid that is required by said final determination, order, or settlement to be refunded, plus the interest thereon specified in the pertinent order of the Commission.

Notwithstanding anything within this agreement to the contrary, in no event shall an underproduced party be entitled to an overproduction payment which is attributable to a price which was higher than the underproduced party could have collected under the

terms of its gas purchase contract, if in existence, at the time the gas was taken by the overproduced party. Further, no overproduced party shall ever be required to make an overproduction payment to an underproduced party, which exceeds the amount the overproduced party actually received for the gas at the time it was produced.

### 7.

This agreement shall be and remain in force and effect for a term concurrent with the term of that certain Operating Agreement between the parties described above to which it comprises the exhibit noted hereinabove.

### 8.

Nothing herein shall change or affect each party's obligations to pay its proportionate share of all costs and liabilities incurred in JOA operations as its share thereof is set forth in the above described Joint Operating Agreement.

### 9.

The terms, covenants and conditions of this Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and assigns. The parties hereto agree to give notice of the existence of this agreement to any successor in interest and make any transfer of any interest in the lease or any part thereof subject to the terms of this Agreement.

*Work Copy*

*Borean Oil Co. @ 8%*

## ACCOUNTING
## FOR
## LEASE PURCHASE AND DEVELOPMENT AGREEMENT
## CASS COUNTY SMACKOVER PROSPECT
## CASS COUNTY, TEXAS

1) To buy into the Prospect and reimburse Borean for original leases:

| | | |
|---|---|---|
| Cass County Iron | 971.43 | net acres |
| E. H. & J. Wiley | 78.93 | " |
| Mary Hurt | 6.07 | " |
| SIDCO Minerals | 55.5 | " |
| Steven Secord | 19.85 | " |
| C.R. Adams | 76.01 | " |
| R. R. Middleton | 76.01 | " |
| Mary C. Pate | 16.00 | " |
| Buddy D. Pate | 25.00 | " |
| K. L. & L. C. Pate | 52.00 | " |
| T. D. & Kim Sutton | 10.00 | " |
| B. J. & R. R. Toombs | 127.96 | " |
| | 1,514.76 | |

Price for the Prospect plus these leases is $1890 per percentage of Working Interest.
For a Working Interest of ___8%___ the price is – PAID – .

2) To buy into new leases obtained after those listed above, the requirement is to reimburse Borean for actual third party landman costs and actual lease payment costs.  These are as follows:

a.) Landman Costs

| Date | Check No. | Amount | Landman |
|---|---|---|---|
| 2/4/99 | 4948 | 2,184.00 | W. Perry Davis |
| 3/1/99 | 4967 | 2,395.00 | " |
| 3/4/99 | 4974 | 1,825.00 | " |
| 3/23/99 | 4984 | 2,625.00 | " |
| 4/1/99 | 4990 | 2,646.00 | " |
| 4/12/99 | 4998 | 1,078.00 | " |
| 2/9/99 | 4952 | 2,667.08 | Tyler Adams |
| 2/15/99 | 4962 | 1,341.67 | " |
| 4/30/99 | 5010 | 1,497.73 | " |
| | | 18,259.48 | |

b.) Lease purchase costs
* Leases bought by Sklar for Borean

| Lease | Paid |
|---|---|
| D. W. Stewart | 529.17 |
| S. S. Mann | 529.17 |
| S. L. Stewart | 529.17 |
| R. G. Hummel | 756.79 |
| R. T. Addington | 273.44 |
| A. L. Bergner | 283.44 |
| F. L. Shimmel | 283.44 |
| O. H. Jenkins | 102.36 |
| J. H. Conway | 102.36 |
| M. Allison | 68.24 |
| L. Gilbert | 68.24 |
| E. W. Hamilton | 170.60 |
| S. H. Lollar | 17.06 |
| D. Hamilton | 17.06 |
| C. H. Echols | 204.72 |
| M. W. Young | 102.36 |
| W. R. Nichols | 2,075.05 |
| J. S. Nichols | 2,075.05 |
| W. R. Nichols, III | 2,075.05 |
| M. B. Nichols | 3,112.55 |
| R. R. Middleton | 1,250.01 |
| C. R. Adams | 1,250.01 |
| | 15,875.34 |

## ACCOUNTING
### FOR
### LEASE PURCHASE AND DEVELOPMENT AGREEMENT
### CASS COUNTY SMACKOVER PROSPECT
### CASS COUNTY, TEXAS

* Leases bought by Borean directly:

| | | |
|---|---|---|
| D. Anderson | 204.13 | (4/5/99) |
| L. G. Anderson | 940.38 | (3/22/99) |
| C. E. Cargile | 628.75 | (3/11/99) |
| F. L. Livingston | 135.00 | (3/15/99) |
| | 1,908.26 | |

* Leases bought by Borean from Trans-Texas Resources:

| | |
|---|---|
| Assignment of 18 leases | 50,084.00 |
| (recorded Vol. 1082, | 67,867.60 |
| P. 824-837, Cass County) | |

C.) Combined Landman/lease costs:

| | |
|---|---|
| Total Landman: | 18,259.48 |
| Total Leases: | 67,867.60 |
| | 86,127.08 |

The above amount is to be reimbursed to Borean at the time of buying into the Prospect.

For a Working Interest of __8%__ the reimbursement due is _– PAID –_.

3.) To buy into the Prospect, it is required that the AFE cost to drill, evaluate, and set casing be paid at the time of signing the final Agreement.

AFE to drill & set casing: 907,250.00. For a Working Interest of __8%__ the payment due is _72,580.00_.

4.) To buy into the Prospect, it is required that payment be made to carry the drilling/casing cost of the 5% Borean Oil Co. carried working interest.

Cost to carry 5% of 907,250.00: 45,362.50

For a Working Interest of __8%__ the payment due is 8/95 of 45,362.50
= 3820.00

5.) The costs accounted for above are to be paid as follows:

| To the owners of Borean Oil Company: | | To the Operator, Sklar-Tex L.L.C.: | |
|---|---|---|---|
| Item 1.) above | _– PAID –_ | Item 3.) above | _72,580.00_ |
| Item 2.) above | _– PAID –_ | Item 4.) above | _3820.00_ |
| Total | _– PAID –_ | Total | _76,400.00_ |

To be paid in two equal checks, 1/2 to
C. R. Lewis _– PAID –_ and
1/2 to M. A. Radley _– PAID –_.

To be paid in ~~one check~~, two checks of 38,200.00 each to Sklar-Tex L.L.C. totaling:
_76,400.00_

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS

| | | |
|---|---|---|
| **BOREAN OIL COMPANY, JON C.** | § | |
| **LEWIS, THOMAS R. LEWIS, DYER S.** | § | |
| **WADSWORTH, CASS COUNTY IRON** | § | |
| **COMPANY, AND JACK L. VAUGHN** | § | |
| **&ASSOCIATES, INC.** | § | |
| | § | |
| **vs.** | § | **CIVIL ACTION NO._____** |
| | § | |
| | § | |
| | § | |
| | § | |
| **SKLAR EXPLORATION COMPANY,** | § | |
| **L.L.C., AND SKLAR-TEX, L.L.C.** | § | |

### ORDER

On this the _____ day of _____, 2000, came on to be heard the Application of Plaintiffs for Hearing on Temporary Injunction and for Order to Arbitrate. And the Court is of the opinion that same should be granted.

It is, therefore, ORDERED, ADJUDGED and DECREED that Defendant Sklar Exploration Company, L.L.C. and Sklar-Tex, L.L.C. appear before this Court on the _____ day of _____, 2000, at _____ a.m./p.m. to show cause why this Court should not enter an Order enjoining the Defendants as requested in Plaintiff's Original Petition and entering an Order compelling the parties to arbitrate their disputes.

Signed this the _____ day of _____, 2000.

_____
JUDGE PRESIDING